**PIONEER COMMERCIAL FUNDING CORP., Plaintiff,**

v.

**UNITED AIRLINES, INC., Defendant.**

**The BANK OF TOKYO TRUST COMPANY, Security Pacific National Bank, and Banque Nationale de Paris, San Francisco Agency, Plaintiffs,**

v.

**UNITED AIRLINES, INC., Defendant.**

**Nos. 89 Civ. 7147 (GLG), 90–Civ. 2296 (GLG).**

United States District Court, S.D. New York.

Jan. 11, 1991.

---

**874**

Weil, Gotshal & Manges, New York City (Marvin E. Jacob, Philip S. Weber, Alexandra Margolis, of counsel), for Pioneer Commercial Funding Corp.

Jones, Day, Reavis & Pogue, New York City (Thomas L. Abrams, of counsel), Broad, Schultz, Larson & Wineberg, San Francisco, Cal. (Marcy J. Bergman, Richard A. Rogan, Pamela J. Tennison, of counsel), for The Bank of Tokyo Trust Co., Sec. Pacific Nat. Bank, and Banque Nationale de Paris, San Francisco Agency.

Winston & Strawn, Cole & Deitz, New York City (Robert S. Fischler, of counsel), Stephen P. Sawyer, Asst. Gen. Counsel, Elk Grove Township, Ill. (Stephen P. Sawyer, of counsel), Winston & Strawn, Chicago, Ill. (Duane M. Kelley, Thomas J. Frederick, of counsel), for United Airlines, Inc.

## OPINION

GOETTEL, District Judge:

### I.  FACTS [1]

Presidential Airways, Inc. ("Presidential"), a Maryland corporation with its principal place of business located in Herndon, Virginia, operated from February 1988 until December 1989 as a feeder airline for United Airlines, Inc. ("United"), a Delaware corporation having its principal place of business in Chicago, Illinois. Specifically, Presidential operated as a "United Express" carrier covering short flights between small cities in the eastern United States and Washington, D.C.'s Dulles International Airport. This arrangement included the issuance to Presidential of a license to use certain of United's marks and logos. As a result, Presidential incurred various obligations to United. In turn, United would book reservations for Presidential and collect customers' airfares. This resulted in United's indebtedness to Presidential based on a percentage of what it had received from the customers.

In order to facilitate the settlement of their accounts, United and Presidential employed the Airlines Clearing House, Inc. ("ACH"), which is a Delaware corporation. ACH is employed by numerous airlines and a formal "Agreement Relating to the Settlement of Interline Accounts through Airlines Clearing House, Inc.," the standard industry agreement, was to be utilized by United and Presidential in this case. As a general proposition, ACH would calculate on a monthly basis the credits and debits incurred by participating airlines. Thereafter, to the extent a party was to receive payment from another party, ACH trans-

---

1. At this stage, the two captioned actions have only been consolidated for discovery purposes.

   We are presently faced with motions in each case to stay the proceeding or dismiss various counts of the complaint. Thus, we must take each complaint's allegations as true. Since the two complaints were filed some five months apart from one another, slightly modified factual allegations are raised. In discussing the facts of these cases, we will attempt to offer one coherent and consistent presentation. This is not, however, to be taken as any formal fact-finding by the court. To the extent it is necessary, we will refer to the first-filed action, No. 89 Civ. 7147, as the "Pioneer" action, and the second-filed action, No. 90 Civ. 2296, as the "Bank Group" action.

ferred the funds from the debtor's account to the creditor's account. In the case at bar, it is alleged that each month United ultimately would be indebted to Presidential. However, since the transfer of funds never occurred until month's end, the amounts owed to Presidential pending ACH's settlement of accounts represented accounts receivable.

On March 30, 1988, it appears that Presidential entered into a contract with Pioneer Commercial Funding Corporation ("Pioneer"), a New York corporation with its principal place of business located in Armonk, New York. Pioneer's business was the lending of money and in this case, the contract stated that Pioneer would provide funding for Presidential's day-to-day operations in the form of a credit line secured by Presidential's accounts receivable. Pioneer's security interest was perfected in Virginia and ACH was given explicit instructions that Pioneer was to receive Presidential's accounts receivable directly each month, rather than having them first go to Presidential only to be subsequently transferred to Pioneer. Between March 1988 and October 1989, Pioneer loaned an unspecified amount to Presidential pursuant to this agreement. Until August 1989, Pioneer was reimbursed through Presidential's accounts receivable as provided for in the contract. Thereafter, however, the troubles leading to this litigation began.

Before addressing the exact claims in the cases before us, the foregoing must be slightly amended to explain the existence of the second suit before us. It appears that in April 1988, and every month thereafter until October 1989, Security Pacific National Bank ("Security Pacific") actually loaned the funds to Pioneer that were subsequently loaned to Presidential. These loans to Pioneer were secured by an assignment of the same Presidential accounts receivable that previously had been assigned to Pioneer by Presidential. Like Pioneer,

Security Pacific perfected its security interest in Virginia, as well as in New York and California. Pioneer thereafter notified ACH of Security Pacific's security interest in Presidential's accounts receivable.[2] Through August 1989, all the parties apparently met their respective obligations. Due to events which will be discussed, however, Pioneer defaulted on its obligations to the Bank Group in October 1989. In part, this instigated the filing of an involuntary chapter 7 bankruptcy petition against Pioneer in the Southern District of New York on January 30, 1990.[3]

One final factual issue must be addressed. It appears that sometime in early 1988, before the Pioneer/Presidential relationship commenced, United loaned $3.5 million to Presidential on an unsecured basis. A promissory note, in turn, was given by Presidential to United. This loan was refinanced at some point and, thereafter, additional loans were made from United to Presidential, the exact total of which is unclear. In August 1989, Presidential issued another a promissory note to United for $3.5 million. This time, however, the note specifically guaranteed payment to United from the same accounts receivable previously assigned to Pioneer and reassigned to the Bank Group. In September 1989, pursuant to United's demand, Presidential allegedly informed ACH to set off United's obligations for that month by the $3.5 million. Consequently, when ACH did its monthly accounting on September 28, United's obligations to Presidential were reduced by $3.5 million and, in turn, Presidential's accounts receivable for that period were reduced by that same amount since less money was transferred by ACH from United's account to Presidential's account. Both Pioneer and the Bank Group, who had perfected security interests in those accounts receivable, claim to have been damaged by this setoff.

2. It appears that in October 1988, The Bank of Tokyo Trust Company and Banque Nationale de Paris, San Francisco Agency, purchased interests in Security Pacific's loans to Pioneer. Since all three banks raise the same claims and are represented by the same counsel, we will simply refer to them as the "Bank Group."

3. On April 20, 1990, the proceeding was converted to a chapter 11 reorganization and remains *sub judice.*

Thereafter, on October 26, 1989, Pioneer filed the first of the pending actions against United for conversion and tortious interference with contract, claiming that United knew of the Pioneer/Presidential contract when it took the setoff. Pioneer's complaint seeks damages for the setoff United actually received, as well as additional, yet unspecified, sums for the future Presidential accounts receivable that would become due to Pioneer, but would be going instead to United pursuant to Presidential's instructions. With regard to these alleged future damages, we note that Presidential filed for chapter 11 bankruptcy protection in the Eastern District of Virginia on the same day the Pioneer complaint was filed. On March 5, 1990, that proceeding was converted to a chapter 7 proceeding and Kermit Rosenberg, Esq. was appointed as trustee by Bankruptcy Judge Bostetter. In its papers and at oral argument before this court, Pioneer's counsel recognized that United would not be receiving further setoffs as of the date Presidential filed for bankruptcy. Thus, notwithstanding any claims for future damages asserted in its complaint, at present Pioneer is only seeking damages for any setoffs actually taken by United prior to Presidential's bankruptcy filing.

Turning to the Bank Group's action, which was filed on April 3, 1990, the Banks seek damages from United for, *inter alia,* impairment of security interests, claiming that their perfected security interest in Presidential's accounts receivable was violated by United's receipt of setoffs. Besides the September setoff previously alluded to,[4] the Bank Group also alleges that two other setoffs totaling approximately $4 million were taken between October 23 and October 25, just days before Presidential's bankruptcy filing and the filing of Pioneer's complaint. Thus, the Bank Group seeks approximately $6.7 million from United.

Presently before us are United's motions to stay or dismiss the two actions. United argues that the automatic stay provisions

of the Bankruptcy Code (the "Code") require the granting of a stay. Moreover, it argues that even if the automatic stay provisions are inapplicable, equity demands that these cases be stayed pending a final resolution of Presidential's and Pioneer's bankruptcy proceedings. Alternatively, United argues that the cases actually should be dismissed on a number of grounds. First, United argues that Presidential is an indispensable party to both actions under the Federal Rules of Civil Procedure. The Code, however, prohibits the joining of Presidential in these actions and, thus, United contends we must dismiss these cases. Additionally, with respect to the Pioneer action, United claims that Pioneer has failed to properly state a claim for either conversion or tortious interference with contract. Similarly, United contends that count three of the Bank Group's complaint, which relates to impairment of a security interest, must be dismissed for failure to state a claim.

## II. DISCUSSION

We will first address the application for a stay of proceedings and then turn to the motions to dismiss.

### A. *Motions for a Stay*

■ The Bankruptcy Code provides that "a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of— ... (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3) (1988). The general purpose of section 362's mandate is to provide a debtor with "a breathing spell from his creditors." *Teachers Ins. & Annuity Ass'n v. Butler,* 803 F.2d 61, 64 (2d Cir.1986). The Code goes on to state that the "estate is comprised of all the following property, wherever located and by whomever held: (1) ... all legal or equitable interests of the debtor in property as of the commencement of the case ... [and] (7)

---

**4.** While Pioneer claims $3.5 million was set off in September, the Bank Group contends the amount actually was closer to $2.7 million. The precise total need not be determined presently and we will simply consider the amount to be $3.5 million because Pioneer's complaint was filed first.

[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(1), (7) (1988). While the foregoing defines what property is included within a debtor's estate, state law governs whether a debtor has an interest in the particular property. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979).

■ United makes slightly different arguments in its applications for a stay in each of the cases before us. In the Pioneer action, the complaint was filed before Pioneer knew Presidential had gone into bankruptcy and, therefore, as previously noted, Pioneer originally sought damages not only for the setoffs United received prior to the complaint's filing, but also for any future setoffs United might take. Consequently, United's motion for a stay initially focused on the possible future setoffs, which were still accounts receivable and, according to United, property of Presidential's estate. *See In re Contractors Equip. Supply Co.*, 861 F.2d 241, 245 & n. 7 (9th Cir.1988) (debtor's mere assignment of future accounts receivable did not transfer title and, therefore, remained property of the estate). Thereafter, however, in its responsive papers and at oral argument, Pioneer made it clear that it was only seeking the funds actually received by United, recognizing that United could not take any further setoffs after Presidential's bankruptcy filing and that the Bankruptcy Court in Virginia would be deciding priority over any future accounts receivable. *See MNC Commercial Corp. v. Joseph T. Ryerson & Son*, 882 F.2d 615, 618 (2d Cir.1989) (pursuant to 11 U.S.C. § 362(a)(7), once a bankruptcy petition is filed, setoff creditors cannot set off any debt arising before commencement of the proceeding without obtaining relief from the automatic stay). Thus, the question becomes whether the funds already set off by United are estate property under the Code.

Pioneer argues that since there is no longer any connection between the funds set off and Presidential's estate, the automatic stay provisions are no longer applicable. In response, United admits it has found no cases supporting a stay in a situation where a plaintiff is only seeking to recoup setoffs already taken, *see* Reply Brief for Defendant at 5, yet seeks a stay nonetheless. We find that the automatic stay provisions are not implicated with respect to the setoffs United has already taken. *Cf. In re Nat'l Equip. & Mold Corp.*, 64 B.R. 239, 245–46 (Bankr.N.D. Ohio 1986) (based on specific contract at issue, debtor's pledge of accounts receivable, the proceeds of which were subsequently transferred to the secured party, divested debtor of any interest in the proceeds and precluded debtor from bringing turnover proceeding). Thus, we now turn to the true focus of United's motion, which is whether a stay is required on equitable grounds.

■ As recognized by the Supreme Court, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936). In certain instances, the power can be used to stay actions that may injure a bankrupt's estate. *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1003 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). The principal issue in this regard is whether Presidential's trustee may be permitted to recapture the funds taken as a setoff by United. Such an action, known as a "preference" action, is generally used by a debtor's trustee to recoup funds from a creditor that were received from the debtor within ninety days of the bankruptcy filing.[5] United's argument is as follows. If it loses to either Pioneer or the Bank Group, and thereby must reimburse either party, it still may be subject to a preference action in the Virgi-

---

5. Generally, 11 U.S.C. § 547(b) (1988) governs preference actions. As to the assertion of a preference to recoup a setoff, it appears that 11 U.S.C. § 553(b) (1988) should govern. *See Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030, 1040 (5th Cir.1987). The parties, however, seem to think that section 547 would apply to the facts presented. This issue is not relevant to the questions before us and need not be presently resolved.

nia bankruptcy proceeding, which means it may face multiple liability for the same actions. Thus, United argues, equitable considerations weigh heavily in favor of staying the actions before this court pending a resolution of the bankruptcy proceedings.

In an effort to alleviate United's concerns, the respective plaintiffs contacted Presidential's trustee, Mr. Rosenberg, to ascertain whether he would agree to waive a preference action. While Mr. Rosenberg would not make such an agreement, he has represented that if United were to lose the instant actions, he would not start a preference action against United. Instead, a preference action would be instituted against Pioneer and/or the Bank Group, depending upon which party prevailed. However, if United were to prevail, Mr. Rosenberg has suggested that he might, in fact, bring a preference action against United. *See In re Presidential Airways, Inc.*, No. 89–02188 (Bankr.E.D.Va. Nov. 19, 1990) (order).[6] United argues that this representation is insufficient since it may be forced to defend the actions before this court and, even if it prevails, then defend a preference action brought by Presidential's trustee in Virginia. Thus, United contends, even if the threat of multiple liability is extinguished, the threat of multiple litigation is sufficient to necessitate a stay of these proceedings.

We find that United is not entitled to any such protection against multiple litigation. United has been assured that it will not be subject to multiple liability and that is all it can ask for. The threat of multiple litigation is simply the cost of doing business and we will not stay the instant actions because of this threat. Incidentally, we note that the threat of multiple litigation is also faced by Pioneer and the Bank Group because any prevailing party may be subject to a preference action.[7]

In United's motion for a stay in the Bank Group action, many of the same contentions are raised. There are, however, two additional points raised. First, since one of the Bank Group's claims is for impairment of a security interest, United refers to section 362(a)(4) of the Code, which stays "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4) (1988). United argues that the lien the Bank Group is seeking to enforce is against property of the estate. Once again, however, there is no authority supporting the proposition that the funds already received by United, a non-bankrupt third-party, are property of Presidential's estate. Thus, the Bank Group's action is not an attempt to enforce a lien against property of the estate. The second argument United proffers is that while the Pioneer action interferes with Presidential's estate, the Bank Group action actually interferes with both Presidential's and Pioneer's bankrupt estates. In essence, United contends that if both Pioneer and the Bank Group are seeking the same funds from United, the Bank Group's claim that it has a superior security interest interferes with Pioneer's claim for these funds. The Bank Group, however, while contending that the automatic stay was not applicable, nonetheless received relief from the automatic stay in the Pioneer bankruptcy action. *See In re Pioneer Commercial Funding Corp.*, No. 90–B–20085 (Bankr.S.D.N.Y.Mar. 30, 1990) (stipulation and order). Thus, the issue is moot. Moreover, both Pioneer and the Bank Group seem to agree that the Bank Group has priority over Pioneer to the extent of its interest and, thus, there does not appear to be any conflict between the Bank Group and Pioneer.

---

**6.** Mr. Rosenberg offers one caveat. If the actions before this court are not resolved before the statute of limitations for asserting a preference claim would run, he would file a protective preference claim merely to preserve his rights. He reiterates, however, that he would not subject United to multiple liability if United loses the instant actions.

**7.** United's other argument in seeking an equitable stay is that it is unreasonable to allow the parties' dispute to be divided between claims for the funds already set off and claims for future damages. We see no problem with having the cases before us focus on the setoffs already taken while claims in the Virginia bankruptcy action focus on future accounts receivable.

For all the foregoing reasons, United's motions for a stay of both the Pioneer and Bank Group actions are denied.

### B. *Motions to Dismiss*

#### 1. Failure to Join an Indispensable Party

United has moved to dismiss both actions pursuant to Federal Rule of Civil Procedure 12(b)(7), claiming that both Pioneer and the Bank Group have failed to join an indispensable party in their respective actions. United claims that Presidential is the necessary party, but that its pending bankruptcy proceeding prevents it from being joined in these actions. Therefore, United argues, the cases should be dismissed.

Federal Rule of Civil Procedure 19, which governs the joinder of parties, requires a two-pronged analysis. First, a court must determine whether a party should be joined because:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). If a party fits within these parameters, but cannot be joined in the action, the court must then "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed.R.Civ.P. 19(b). The rule then lists four different factors to consider in making this "equity and good conscience" determination, but at this stage we need not address them. We only point out the Second Circuit's mandate that a court "should take a flexible approach when deciding what parties need to be present for a just resolution of the suit." *Jaser v. New York Property Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987).

In the cases at bar, United argues that Presidential is indispensable based on rule 19(a)(1) and both provisions of rule 19(a)(2).[8] We will address these provisions in turn. As to rule 19(a)(1), the section focuses on whether complete relief can be accorded among those already parties in the absence of the third, ostensibly indispensable, party. Since this section focuses on the parties already present, both Pioneer and the Bank Group argue that any potential claims that Presidential may have against United in a preference action have no bearing on this inquiry. In other words, the rights of Pioneer and the Bank Group vis-a-vis United can be resolved in the actions before this court and it is unnecessary to involve Presidential in these proceedings. *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York*, 762 F.2d 205, 209 (2d Cir.1985) ("complete relief refers only 'to relief as between the persons already parties, and not as between a party and the absent person whose joinder is sought'" (quoting 3A J. Moore, *Moore's Federal Practice* ¶ 19.07–1[1], at 19–96 (2d ed. 1984))). In retort, however, United argues that the section is not to be narrowly interpreted since it "furthers the interests not only 'of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter.'" *Evergreen Park Nursing & Convalescent Home, Inc. v. American Equitable Assurance Co.*, 417 F.2d 1113, 1115 (7th Cir.1969) (quoting Fed.R.Civ.P. 19(a)(1) advisory committee's note (1966 amendment)). While it is true that the disputes in the two actions before us and in a potential preference action would involve the very funds that United set off, this alone is insufficient to make Presidential indispensable. A preference action involves inquiries entirely different than those necessary for questions of conversion, tortious interference with contracts, and impairment of security inter-

---

8. Actually, the papers United submitted in the Pioneer action did not refer to rule 19(a)(1). Its papers in support of the motion to dismiss the Bank Group's action, however, refer to rule 19(a)(1) as well.

ests, which will be presented before us. There actually is no impending threat of duplicative litigation. Thus, even under United's broad interpretation of rule 19(a)(1), Presidential is not a necessary party.

Turning now to rule 19(a)(2), the first question is whether Presidential "claims an interest relating to the subject of the action." Fed.R.Civ.P. 19(a)(2). We note that Presidential's trustee has never made any formal claim to these funds, but rather, has merely sought to preserve any rights to a preference action that might exist. For that matter, since Presidential received loans from United, Pioneer, and, indirectly, the Bank Group in exchange for its pledge of an interest in its accounts receivable, it is unlikely that Presidential would have had any rights whatsoever to these funds had it not filed for bankruptcy protection. It would be ironic if the mere fortuity of Presidential's bankruptcy filing would allow it to be deemed an indispensable party to an action involving funds it would have had no cognizable rights to had it remained solvent. Nonetheless, we will assume for these purposes that Presidential has made such a claim.

■ The question then becomes whether United can establish that if Presidential is absent either Presidential's ability to protect its rights will be impaired, Fed.R. Civ.P. 19(a)(2)(i), or United will be faced with a substantial risk of multiple or inconsistent obligations, Fed.R.Civ.P. 19(a)(2)(ii). As to the first question, United argues that since the parties are seeking Presidential's accounts receivable, Presidential's interests may be impaired. As we previously noted, however, in conjunction with our discussion of the automatic stay issue, while Pioneer initially was seeking to recover future accounts receivable, in light of Presidential's bankruptcy it has limited the scope of its claims before us to those setoffs already taken, just as the Bank Group has done. As to the funds already in United's coffers, our earlier determination that these are not property of Presidential's estate remains applicable. To the extent Presidential re-

tains a right to assert a preference action, it can adequately protect its rights through this vehicle. There is no need for Presidential to join the actions at bar to protect its rights.

■ The next inquiry, and the argument United focuses most heavily upon, is whether United will be faced with multiple or inconsistent judgments if Presidential is absent from these suits. As we previously noted, Presidential's trustee has stated that while he will not waive the right to bring a preference action, he will only make such a claim against the prevailing parties in the actions before us. Thus, United faces no risk of multiple liability, no less the substantial risk required by the rule. Moreover, there is no risk of inconsistent judgments because while the actions before us concern the propriety of United's actions vis-a-vis Pioneer and the Bank Group, a preference action involves United and Presidential and wholly different issues. The only risk to United is the risk of multiple litigation if it prevails before us. This threat alone is insufficient to make Presidential a necessary party as it is the risk of multiple liability, which does not exist in these cases, that matters. *See Arkwright–Boston Mfrs.*, 762 F.2d at 209 (fact that party may be forced to defend two actions arising from one tort does not make absent plaintiff indispensable). In addition, we again note that the risk of multiple litigation is borne by all parties before us since the trustee has stated that if he asserts a preference action, it will be against any prevailing party.

For all the foregoing reasons, we find that Presidential is not an indispensable party. United's motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(7) are denied.[9]

### 2. Failure to State a Claim

United has moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Pioneer's claims for both conversion and tortious interference with contract, and the Bank Group's claim for impairment of a

---

**9.** Having based our ruling upon United's failure to satisfy rule 19(a)'s requirements, we need not address the factors enunciated in rule 19(b).

security interest. On a motion pursuant to rule 12(b)(6), a complaint's claims are taken "at face value," *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972), and dismissal is warranted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). With these guidelines in mind, we can proceed to tackle the instant motions.

### a. *Pioneer Action*

As an initial matter, we note that both causes of action United seeks to dismiss are governed by state law. At this stage, it appears that three states' laws can possibly apply: New York, where Pioneer is located; Illinois, where United is located; or Virginia, where Presidential is located. However, since the parties agree that either Illinois or New York law would govern these claims and that the laws of these states are virtually identical on the relevant issues, we need not presently resolve this choice-of-law question and instead will refer to both Illinois and New York law. Moreover, to the extent the Uniform Commercial Code (the "UCC") is at issue, the parties concede that there is no material difference between the versions adopted by New York and Illinois with respect to the issues before us.

### i. Failure to Demand Payment Pursuant to UCC 9–318

United first moves to dismiss both the conversion and tortious interference with contract claims based on Pioneer's alleged failure to both notify United that the accounts receivable had been assigned and specifically demand payment from United. United relies on New York's Uniform Commercial Code section 9–318(3) for this proposition. That section reads:

> The account debtor is authorized to pay the assignor until the account debtor re-

ceives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor.

N.Y.U.C.C. § 9–318(3) (McKinney 1990).[10] United argues that the clause "notification ... that payment is to be made to the assignee" requires an actual demand for payment by the assignee to the debtor. Since Pioneer failed to allege making such a demand, United argues that Pioneer has forfeited its legal remedies and, therefore, cannot claim that United was unjustified in taking the setoff. Pioneer, in turn, claims that section 9–318 is inapplicable in the case at bar because its security interest has priority over any right to a setoff possessed by United. Moreover, Pioneer contends that even if section 9–318 is applicable, there is simply no requirement that a demand for payment be made. Finally, if such a demand is required, Pioneer argues that it satisfied this requirement by instructing ACH to transfer Presidential's accounts receivable directly to its account and by perfecting its security interest.[11]

The first question raised, therefore, is whether or not section 9–318 applies in this situation. The parties do not dispute the fact that article 9, which governs secured transactions, is applicable in this case. While holders of setoff rights are not required to file under article 9 to protect their rights, N.Y.U.C.C. § 9–104(i) (McKinney 1990), the UCC nonetheless governs the priority of setoff rights versus secured interests. *See MNC Commercial Corp. v. Joseph T. Ryerson & Son,* 882 F.2d 615, 619 (2d Cir.1989). The dispute in this case focuses on deciding which of the specific sections contained within article 9

---

**10.** As previously noted, the parties agree that New York's UCC does not differ from Illinois', or most other states' for that matter, on this issue. While we have cited to New York's statute, the cases we rely on are not so limited.

**11.** Though the Pioneer complaint does not state when Pioneer's secured interest was perfected, the Bank Group's complaint alleges that the necessary filing was accomplished on April 1, 1988.

are applicable. Pioneer argues that by perfecting its security interest before any purported agreement permitting a setoff was entered into between Presidential and United, the general first in time, first in right rule governs, N.Y.U.C.C. § 9–312(5)(a) (McKinney 1990), and section 9–318 is irrelevant. In response, United claims that notwithstanding the general rule, the UCC can provide otherwise in establishing priorities of claims. *See Griffin v. Continental Am. Life Ins. Co.*, 722 F.2d 671, 673 (11th Cir. 1984); *Chase Manhattan Bank v. State*, 40 N.Y.2d 590, 357 N.E.2d 366, 368, 388 N.Y.S.2d 896, 898 (1976). United argues that section 9–318 is one such provision providing otherwise when an assignee, secured or otherwise, fails to give the requisite notices to a debtor. As will become clear from the remainder of our decision, however, even assuming section 9–318 applies, Pioneer's allegations are sufficient to prevent dismissal of the case. Therefore, we need not resolve the question of whether section 9–318 interferes with the general rule giving first-filed secured creditors priority over unsecured creditors claiming a right to a setoff.

■ At this time, we must proceed with a more detailed analysis of United's argument. United focuses on section 9–318(3), which establishes the rights of a debtor to pay an assignor until it receives "notification that the amount due or to become due has been assigned and that payment is to be made to the assignee." N.Y.U.C.C. § 9–318(3). United interprets the second clause of this section as requiring the assignee to explicitly *demand* payment from the debtor, in addition to giving notice of the assignment. *See Haas v. Metro–Goldwyn–Mayer, Inc.*, 617 F.2d 1136, 1140 (5th Cir.1980); *First Trust & Sav. Bank of Glenview v. Skokie Fed. Sav. & Loan Ass'n*, 126 Ill.App.3d 42, 81 Ill.Dec. 246, 248, 466 N.E.2d 1048, 1050 (1984). United then takes a drastic, and unsupported, leap to its contention that since Pioneer does not allege making such a payment demand, *a fortiori*, its rights are subordinated to

those of United. In essence, the argument United raises is one of "standing" since United claims that Pioneer's failure to make the formal demand allegedly required by section 9–318(3) precludes it from later bringing suit based on United's interference with Pioneer's rights to the assigned accounts receivable. *See* United's Memorandum of Law at 15. This view is simply erroneous.

Section 9–318(3) governs the rights of a debtor to pay an assignor until it receives certain notices, and perhaps demands, from an assignee. The section is designed to prevent a debtor from being forced to pay twice, *see Warrington v. Dawson*, 798 F.2d 1533, 1535–36 (5th Cir.1986); *Haas*, 617 F.2d at 1139, but in no way does it excuse the debtor from meeting its obligations. In fact, since the assignor often remains liable to the assignee based on the underlying obligation, even if the debtor pays the assignor, and is thereby protected from paying twice by section 9–318(3), the assignee still may be paid from the funds received by the assignor. In the case at bar, however, United does not suggest that it is being forced to pay twice and, therefore, section 9–318(3) is simply inapplicable. We also note that in seeking a stay based on Presidential's potential ability to assert a preference claim, United actually suggests that its taking of the setoff amounted to a payment *from* Presidential, rather than *to* Presidential. This is the complete antithesis of the purpose behind section 9–318(3).[12]

■ The key provision in section 9–318, and one which United touches on in a cursory fashion, is sub-division 1. *See Chase Manhattan Bank*, 388 N.Y.S.2d at 898–99, 357 N.E.2d at 368–69 (rights of secured party to accounts receivable versus account debtor's rights to setoff governed by section 9–318(1)); *Central State Bank v. State*, 73 Misc.2d 128, 341 N.Y.S.2d 322, 325 (Ct.Cl.1973) (same). This provision states in pertinent part that:

[T]he rights of an assignee are subject to (a) all the terms of the contract between the account debtor and assignor and any

---

12. We recognize that an argument possibly can be made that United's setoff constituted a payment *to* Presidential because it decreased the debt Presidential owed. This argument has not been raised and, moreover, we do not believe such a situation is contemplated by section 9–318(3).

other defense or claim arising therefrom; and

(b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

N.Y.U.C.C. § 9–318(1) (McKinney 1990). Under this section an assignee retains its assigned rights, but these rights may be subject to claims the account debtor could have raised against the assignor. *See Chase Manhattan Bank*, 388 N.Y.S.2d at 898–99, 357 N.E.2d at 368–69. In the case at bar, therefore, the rights of the assignee, Pioneer, are subject to the claims that the account debtor, United, could have asserted against the assignor, Presidential. Thus, Pioneer's rights to Presidential's accounts receivable may be subject to a setoff by United, to the extent such a setoff could have been asserted by United against Presidential.

▆▆▆▆▆ Turning to section 9–318(1), sub-division (a) requires our review of the Presidential/United contract to see if a right of setoff is established therein. If it is, Pioneer takes its assignment subject to that right, regardless of when United received notification of the assignment. United contends that its right to a setoff did arise out of the same contract as its obligation, thereby implicating section 9–318(1)(a), but admits that this issue is not presently before us. United's Reply Memorandum of Law at 16 n. 14. Turning to section 9–318(1)(b), therefore, the provision specifically states that the assignee takes subject to the debtor's claims against the assignor that accrue prior to the debtor's receipt of *notification* of the assignment. United suggests that notification of the assignment in this context requires both notification of the assignment and a demand for payment, which is precisely the interpretation it gives to section 9–318(3). Unfortunately, this proposition ignores the

fact that the language used in sub-divisions 1 and 3 of section 9–318 is not identical. While a two-pronged notice requirement is mandated by sub-division 3, only notification of the assignment is required under sub-division 1. If notification of the assignment in sub-division 1 means both notification of the assignment and a demand for payment as United contends, it would be redundant to specifically include both requirements in sub-division 3. Looking at the specific language of the statute, it appears clear that the responsibilities incumbent upon an assignee under section 9–318(1) are less stringent than those required by section 9–318(3). This may be a function of the differing purposes of the two provisions. United's attempt to merge the sections ignores the statutory language and clouds the true issues before us.[13]

Having decided that notification under section 9–318(1)(b) does not require a demand for payment, the next issue we would ultimately need to resolve is whether United's purported right to a setoff accrued before or after the account debtor received notification of the assignment. N.Y.U.C.C. § 9–318(1)(b); *see Chase Manhattan Bank*, 388 N.Y.S.2d at 899, 357 N.E.2d at 369 (requiring actual, rather than constructive, notice under section 9–318(1)(b)). In the Bank Group's complaint, it is alleged that United was on notice of the Pioneer assignment as early as April 1988. Complaint ¶ 16. This issue is not before us, however, at the present time. In addition, if there is, in fact, a right to a setoff in the Presidential/United contract itself, as United contends, the issue of notice is irrelevant. N.Y.U.C.C. § 9–318(1)(a).

For all the foregoing reasons, we find United's contention that a demand for payment was required as a condition precedent to Pioneer's claims to be without merit. Since this is the final ground raised for dismissing the claim of tortious interference with contract,[14] that cause of action

---

**13.** Even if section 9–318(1)(b)'s notification requirement was meant to include both provisions of section 9–318(3), it is not settled that a specific demand for payment, as opposed to simply actual notice of the assignment and the assignee's right to payment, is required by section 9–318(3).

**14.** United actually makes little mention of the tortious interference claim, only suggesting that if a party's actions are justified the cause of action cannot stand. United contends that its actions were justified because Pioneer never made a demand for payment. Having rejected that argument, we can similarly dispose of the

will stand. There is, however, an additional argument raised with respect to the conversion claim.

### ii. Specifically Identifiable Property

Conversion is the "[u]nauthorized and wrongful exercise of dominion and control over another's personal property." *Black's Law Dictionary* 300 (5th ed. 1979).

> [T]o establish a cause of action in conversion, the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights. Tangible personal property or specific money must be involved.

*Independence Discount Corp. v. Bressner,* 47 A.D.2d 756, 365 N.Y.S.2d 44, 46 (2d Dep't 1975) (citations omitted).

■ United argues that Pioneer's complaint does not allege the conversion of specifically identifiable property and, thus, must be dismissed. As previously discussed, United sold tickets for Presidential flights and when customers paid United for these tickets, United incurred an obligation to Presidential. These obligations became accounts receivable for Presidential. At month's end, United sent an account statement to ACH listing these accounts payable, Complaint ¶ 15, and ACH then would settle the parties' accounts by offsetting their mutual obligations. This ultimately resulted in a net obligation running from United to Presidential and any necessary payments—or, more accurately, transfers—were then made. In the month at issue, however, United set off a portion of the amount it owed Presidential to account for debts it was owed by Presidential, thereby substantially reducing the funds Presidential received for that month. United contends that the funds claimed by Pioneer were received from customers and then placed into United's general coffers to be used for any corporate purpose, provided, of course, that at month's end the amounts owed to Presidential were duly

transferred to ACH. Thus, Pioneer claims, the funds at issue are not specifically identifiable. *See id.* ("there was no specific fund from which payment had to be made, hence there could be no conversion"). Moreover, United contends that even if it could not use the funds for any purpose, the fact that Presidential's accounts receivable held by ACH included obligations of airlines besides United meant that the funds were commingled and again, ceased being specifically identifiable. At most, United argues, it had a general obligation to pay Presidential—actually ACH—but "the general rule is that conversion will not lie for money represented by a general debt or obligation." *In re Thebus,* 108 Ill.2d 255, 91 Ill.Dec. 623, 626, 483 N.E.2d 1258, 1261 (1985); *see also Luxonomy Cars, Inc. v. Citibank, N.A.,* 65 A.D.2d 549, 408 N.Y.S.2d 951, 954 (2d Dep't 1978) (mere creation of debtor/creditor relationship through checking account does not satisfy requirement of establishing specific and identifiable property). In other words, while a party who owes a debt but fails to satisfy the obligation may be liable on certain legal theories, conversion is not one of them.

■ United correctly cites the general rule that the mere establishment of a debtor/creditor relationship is insufficient to create a cause of action for conversion when the debtor fails to satisfy its obligations. This stems from the fact that no specifically identifiable money has been taken or is owed. In the case at bar, United is a debtor and Pioneer, by virtue of the assignment from Presidential, is a creditor. While the technical relationship between the parties suggests the general rule should apply, the underlying facts distinguish this case from the ordinary debtor/creditor relationship. Pioneer is not simply alleging the conversion of money through the failure to satisfy a debt, but rather, is claiming the conversion of funds represented by accounts receivable held at ACH on its behalf. This distinction is not merely a matter of semantics since these

---

suggestion that United's actions were justified on this basis. Therefore, Pioneer's claim of

tortious interference with contract cannot be dismissed.

receivables, while resulting from accounting entries, nevertheless represent tangible, marketable assets which can be sold, secured, or traded. Indeed, Pioneer, and thereafter the Bank Group, secured its interest in Presidential's receivables held at ACH in order to obtain a priority over these funds.[15] Thus, when United kept the funds it allegedly was required to transfer to ACH, it allegedly violated Pioneer's proprietary rights in a specific and identifiable piece of property, namely Presidential's accounts receivable.

Nonetheless, even if this action merely were to be considered one for the conversion of money, the claim would stand. There is no prohibition on instituting a conversion claim for money, provided it is "specific money." *Independence Discount Corp.*, 365 N.Y.S.2d at 146. The principal reason funds represented by a general debt or obligation cannot be converted is the absence of specifically identifiable property. In essence, a debtor is required to make payment and this payment generally can come from any source. In the case at bar, United argues that the funds it received from customers could be used for any corporate purpose. However, it seems to us that when United received the funds from customers it was acting, in effect, as an agent of Presidential, thereby incurring an obligation to Presidential and its assignees. This may have included an obligation to keep the funds segregated, but at present the exact nature of United's obligation to Presidential is unclear. In *In re Thebus*, a case cited by United, the court dismissed a claim for conversion but went on to suggest that if the funds held by the debtor and allegedly converted from the plaintiff, a governmental agency, had come from an outside source, an action for conversion might have existed. *Thebus*, 91 Ill.Dec. at 627, 483 N.E.2d at 1262; *cf. Independence Discount Corp.*, 365 N.Y. S.2d at 46 (if payment to creditor had to be made from segregated fund, conversion action may exist). Thus, it can be argued that when United received funds from customers as an agent of Presidential, it was holding specific and identifiable property belonging to another. In fact, Pioneer alleges that in the course of making loans to Presidential it was given daily reports concerning Presidential's flights, customers, and schedules. Complaint ¶ 27. This might suggest that in order to provide this information to Pioneer, Presidential necessarily was kept apprised of the amounts United was collecting on its behalf. At this stage of the proceedings, it is simply impossible to tell the exact nature of the obligations among the parties. At a minimum, Pioneer's allegations satisfy the requirements of rule 12(b)(6) and United's motion to dismiss the conversion claim for failure to allege the conversion of specifically identifiable property is denied.[16] This, of course, does not mean that following further discovery a different conclusion on this issue might not be reached.

b. *Bank Group Action*

Count three of the Bank Group's complaint alleges that United's setoff im-

---

**15.** We have not been pointed to any authority stating that an action for conversion of accounts receivable can never be brought, and it appears that some courts may be willing to recognize the cause of action under the right factual circumstances. *See, e.g., Zokoych v. Spalding*, 36 Ill. App.3d 654, 344 N.E.2d 805, 809 (1976); *Melvin v. Klein*, 49 Misc.2d 24, 266 N.Y.S.2d 533, 536 (Sup.Ct. Onondaga County 1965). While these courts did not expressly embrace the cause of action, they also did not specifically dismiss the claim when it was asserted before them. We recognize, of course, that this authority, assuming it can be denominated as such, has minimal precedential value.

**16.** As to the question of whether the funds are no longer specifically identifiable once they go to ACH, assuming they had been segregated in the first place, this appears to be a non-issue raised by United. As alleged, the funds in this case were converted before being sent to ACH. Thus, it seems irrelevant what would have happened to the funds had they ultimately reached ACH. Nonetheless, further factual development would be needed as to whether the funds were ordinarily commingled since ACH only handled airline accounts and the extent to which other airlines contributed to Presidential's accounts receivable is unclear.

paired its security interest in Presidential's accounts receivable. United moves to dismiss this count, arguing that the UCC only permits such a claim to be asserted by a guarantor, which the Bank Group is not. Moreover, to the extent the cause of action exists outside the UCC, United contends that such relief is limited to a mortgagee whose secured property is being damaged or impaired.

We have previously recognized that this case involves property secured under article 9 of the UCC. Consequently, United suggests that it is only the UCC that can provide relief for the Bank Group under a theory of impairment of security interest, and that only a guarantor has such a remedy available under the UCC. In *Executive Bank of Fort Lauderdale v. Tighe*, 54 N.Y.2d 330, 429 N.E.2d 1054, 445 N.Y.S.2d 425 (1981), for example, the court referred to section 3–606 of the UCC, which is entitled "Impairment of Recourse or of Collateral," [17] and stated that "[t]he purpose of the provision is as concerns a guarantor to protect him against the increase in liability he is subject to if the collateral for the guaranteed loan is not available for payment of the loan or for reimbursement ... of the guarantor after he has been required to pay the borrower's debt." *Executive Bank*, 445 N.Y.S.2d at 428, 429 N.E.2d at 1057. While the *Executive Bank* court did, in fact, refer to the rights of a guarantor, it did not, as United seems to suggest, state that common law remedies under a similar theory were abolished. Even if the UCC did limit claims under this theory to guarantors, principles of law and equity supplement the provisions of the UCC. *See* U.C.C. § 1–103 (McKinney 1964). Therefore, the rights of the Bank Group in their secured property are not limited solely to causes of action recognized by the UCC.

■ Numerous courts have recognized such a cause of action outside the UCC.

By definition, impairment of security interest requires proof of "(1) a wrongful act of the defendant; (2) impairment of security resulting from that act; and (3) the amount of such impairment." *Syracuse Sav. Bank v. Onondaga Silk Co.*, 175 Misc. 811, 26 N.Y.S.2d 448, 450 (Sup.Ct. Onondaga County 1940). In response, United argues that even if the tort of impairment of security interest exists generally, it is recognized only where the secured party is a real property mortgagee. While it is true that many of the cases dealing with impairment of security interests involve real property mortgages, *see, e.g., Rakosi v. General Elec. Credit Corp.*, 59 A.D.2d 553, 397 N.Y.S.2d 416, 418 (2d Dep't 1977), there is no reason why other secured interests cannot be protected in a similar fashion. Indeed, courts have recognized that this cause of action may exist where payment of a note is secured by a chattel mortgage. *See Heinaman v. George W. Haxton & Son*, 242 A.D. 62, 272 N.Y.S. 598, 600 (4th Dep't 1934); *see also Montgomery Ward & Co. v. Othmer*, 127 A.D.2d 913, 512 N.Y.S.2d 273, 274 (3d Dep't 1987) (recognizing replevin action for impairment of security interest in goods consigned to defendant). We simply do not see why such causes of action must be limited to mortgagees.

■ To the extent mortgagees are afforded relief under such a cause of action, it is often because they lack an immediate possessory interest in the property and this is the only way they can protect their rights. " 'A mortgagee may under special circumstances bring an action to recover damages for the impairment of his security, though he has not the right of immediate possession.' " *Heinaman*, 272 N.Y.S. at 600 (quoting *Norton v. Shields*, 174 App.Div. 804, 161 N.Y.S. 880, 881 (4th Dep't 1916)). In the case at bar, it appears that the Bank Group might just as easily have asserted a claim for conversion of its

---

**17.** Section 3–606 states that "[t]he holder discharges any party to the instrument to the extent that without such party's consent the holder ... unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse." N.Y.U.C.C. § 3–606 (McKinney 1964).

property. As previously noted, this would require proof of ownership or of a right to possession of the converted money or property. We do not express any opinion as to which cause of action would have been more appropriate. Nonetheless, the Federal Rules of Civil Procedure only require the pleading of a claim and the specific label given to a cause of action is unimportant. *See Newman v. Silver*, 713 F.2d 14, 15 n. 1 (2d Cir.1983) ("the nature of federal pleading ... is by statement of claim, not by legal theories"); *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir.1945) ("particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not"). What is important is whether the facts alleged create a claim upon which relief can be granted and, at this stage, the Bank Group has satisfied this burden.

Therefore, United's motion to dismiss count three of the Bank Group's complaint is denied.

## III. CONCLUSION

United's motions for stays in the Pioneer and Bank Group actions are denied. Likewise, its motions to dismiss pursuant to rules 12(b)(6) and 12(b)(7) of the Federal Rules of Civil Procedure are denied in all respects. The parties in both actions are directed to appear at a rule 16 scheduling conference on Monday, February 11, 1991 at 5:15 p.m.

SO ORDERED.