**William FORTUNE, individually and as Executor of the Estate of Paul Paroski, Plaintiff,**

v.

**MEDICAL ASSOCIATES OF WOODHULL, P.C., BCS Life Insurance Company, and Frank December, Defendants.**

**No. 91–CV–3888 (SJ).**

United States District Court, E.D. New York.

Oct. 13, 1992.

Mark Scherzer, New York City, for plaintiff William Fortune.

Peter G. Eikenberry, Seyfarth, Shaw, Fairweather & Geraldson, New York City, for defendant BCS Life Ins. Co.

Robert E. Deright, Jr., Epstein Becker & Green, New York City, for defendant Medical Associates of Woodhull, P.C.

## MEMORANDUM AND ORDER

JOHNSON, District Judge:

Plaintiff William Fortune brings this action individually and as Executor of the Estate of Paul Paroski pursuant to Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B), (a)(2), (a)(3), (e)(1) alleging breach of contract, breach of fiduciary duty, and negligence in procuring an insurance contract. In lieu of answering the complaint, defendant Medical Associates of Woodhull, P.C. moves for an order pursuant to Fed. R.Civ.P. 12(b)(6) dismissing the First and Second Causes of Action against it, or in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56. Defendant BCS Life Insurance Company also moves for summary judgment dismissing the complaint against it.

For the reasons stated below, the motion by Medical Associates of Woodhull, P.C. is granted in part and denied in part. The motion by BCS Life Insurance Company is denied.

## I. BACKGROUND

In July 1984, Medical Associates of Woodhull, P.C. ("Woodhull") hired Dr. Paul Paroski as a physician. Dr. Paroski was appointed Director of Ambulatory Care pursuant to an August 1987 contract. Schedule B of the contract lists the following benefits: Life Insurance/Accidental Death; Hospital & Surgical Coverage; Major Medical Coverage; Long Term Disability; Dental Coverage; Annual Leave; Personal Days; Holidays; Conference Days; Retirement Plan; and Travel & Accident Insurance. According to Schedule B, Dr. Paroski was entitled to a $200,000 initial life insurance benefit and an Accidental Death benefit equal to two times the insured benefit. The contract expressly provides that "all benefits are subject to modification by the Corporation in its sole and exclusive discretion."

Pursuant to the contract with Woodhull, Dr. Paroski became insured under a group life insurance policy issued by John Hancock Mutual Life Insurance Company. The John Hancock Certificate ("Hancock Certificate") also expressly states that "[n]o amendment, renewal or termination of the Policy shall require the consent of or notice to any employee or beneficiary or other person having a beneficial interest thereunder."

In or about March 1989, Dr. Paroski became ill. By August 1989, Dr. Paroski was totally disabled and unable to perform his duties as Director of Ambulatory Care. On or about November 21, 1989, Dr. Paroski sent a memo to the President and Executive Director of Woodhull stating he was resigning as Director of Ambulatory Care subject to several stipulations. Dr. Paroski allegedly withdrew that resignation when Woodhull refused to meet his conditions. Nevertheless, Woodhull continued to list his status as "active". Although Dr. Paroski sporadically participated in his professional duties until his death on March 3, 1990, he never worked more than 20 hours in any week after August 1989.

In or about late summer/early fall 1989, Woodhull's benefits consultant, Williams, Thacher & Rand, Inc. ("WTR") began soliciting quotations on new health and life insurance policies covering Woodhull's employees. The best bid was submitted by Empire Blue Cross and Blue Shield ("Em-

pire"). Empire would provide health coverage and BCS would provide life insurance coverage. On September 20, 1989, Woodhull's Benefits Committee met to discuss the proposed health and life insurance plans. Frank December ("December"), an Empire representative, attended the meeting to discuss the policies.

On October 13, 1989, WTR sent December the following letter:

In view of the upcoming November 1 consolidation, we would like to know how your contract responds (by way of continued coverage) when an employee is on short or long term disability. How are the life, dental, medical, and LTD coverages affected?

December responded by following letter dated October 30, 1989:

In response to your letter concerning the Life, Medical and Dental coverages should a member of the above group be out on long term disability.

As long as Medical Associates continues to carry the employee on their group and remits premiums for that individual, there is no change in the aforementioned programs.

On or about October 31, 1989, Woodhull terminated its group life insurance with John Hancock and purchased a substitute group life insurance policy from BCS Life Insurance Company with an effective date of November 1, 1989. WTR sent December the following letter dated December 20, 1989:

Confirming our luncheon date with Woodhull, the Hancock group life contract did not contain a conventional "waiver of premium" provision; therefore it is imperative that your contract pick up disabled employees on 11/1/89 even though they were NOT "actively at work." These employees were on the census data supplied to for your quotation. Furthermore, Woodhull has continued to pay premiums for these disabled employees as "active participants" as verified by your letter of 12/14/89. As agreed, your life contract through your subsidiary will contain no "waiver of premium" clause but will allow Woodhull to carry the employee on the group as long as they remit premiums for this individual.

Please indicate your concurrence with this letter by signing the copy enclosed and returning it to my attention.

Although the letter was never signed and returned to WTR, Woodhull paid and BCS accepted premiums on behalf of Dr. Paroski. The next day Gary Aspenberg, Director of Personnel & Labor Relations at Woodhull, sent Dr. Paroski a letter stating:

Life insurance, unlike the above items must be continued under our *new* policy with Blue Cross/Blue Shield. This means that the P.C. must continue to fund this item as an active expense. We are doing so at present, but I cannot at this time give you a prediction as to how long this benefit will be provided. You will be notified in advance of any changes in this insurance.

Dr. Paroski passed away on March 3, 1990. William Fortune, the named beneficiary under the policy and executor or Dr. Paroski's estate, submitted a claim to BCS which it denied.

## II. ANALYSIS

### A. Woodhull's Motion to Dismiss and/or for Summary Judgment

#### 1. *Preemption of Breach of Contract Claim*

Woodhull seeks to dismiss Fortune's First Cause of Action for breach of their employment contract on the ground that it is preempted by ERISA. Section 514(a) of ERISA provides that the statute "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C.A. § 1144(a) (1985). An employee welfare benefit plan is defined under ERISA as:

[A]ny plan, fund or program ... established or maintained by an employee or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing ... insurance ... or benefits in the event of sickness, accident, disability, death or un-

employment, or vacation benefits, apprenticeship .or other training programs, or day care centers, scholarship funds, or prepaid legal services. . . .

29 U.S.C.A. § 1002(1) (1992).

■ When Congress enacted ERISA, it intended the statute to have a broad preemptive effect. *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987). ERISA preempts any state law which has a connection with or makes reference to an employee welfare benefit plan. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–7, 103 S.Ct. 2890, 2899–90, 77 L.Ed.2d 490 (1983). It preempts not only claims under state statutes, but common law causes of actions as well. *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. at 47–8, 107 S.Ct. at 1553.

■ The Department of Labor has issued the following regulations excluding certain group or group-type insurance programs under ERISA:

> For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to an employees or members of an employee organization, under which
>
> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation the [sic] program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j). The mere purchase of insurance by an employer does not by itself establish an ERISA covered plan, but may be evidence that one exists. *Kanne v. Connecticut General Life Insurance Co.,* 867 F.2d 489 (9th Cir.), *cert. denied* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989).

■ The issue of whether the John Hancock or BCS policy are governed by ERISA must be decided before the Court can make a determination as to whether the breach of contract claim is preempted. "The existence of an ERISA plan is a question of fact which must be determined in light of all surrounded facts and circumstances." *Kanne v. Connecticut General Life Ins. Co.,* 867 F.2d at 492. Based upon Woodhull's own admission that it funded its group insurance plans, the Court finds that the Hancock and BCS group life insurance plan to be covered by ERISA. Therefore, ERISA preempts Fortune's First Cause of Action for breach of contract as it relates to an employee welfare benefit plan.

**B. Claim for Breach of Fiduciary Duty**

Woodhull also moves to dismiss Fortune's Second Cause of Action for failure to state a claim, or in the alternative for summary judgment. Plaintiff alleges that Woodhull breached its fiduciary duty by allowing the Hancock benefits to lapse without replacing them for all its employees. ERISA provides that "a person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C.A. § 1002(21)(A)(1992). In exercising his or her duties, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (1985).

Woodhull argues that it had no duty to indefinitely maintain Dr. Paroski's life insurance benefit because "the relevant plan document in this case demonstrates that

Woodhull expressly and unambiguously reserved its right to modify or terminate the Hancock insurance policy." Woodhull relies primarily on *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488 (2d Cir. 1988), in which the Second Circuit held that an ERISA employee welfare benefits is not subject to amendment by informal communications.

■ However, this case may be distinguished because Fortune is not claiming that the plan was amended. Fortune alleges that Woodhull breached its fiduciary duty by carelessly purchasing a new insurance contract without fully satisfying itself that BCS would provide the desired coverage. The courts recognize that an employer's misrepresentation of an employee's rights under an ERISA plan may constitute a breach of fiduciary duty. For example, in *Eddy v. Colonial Life Insurance Co. of America*, 919 F.2d 747 (D.C.Cir.1990), the plaintiff claimed that his insurer breached its fiduciary duty by misinformed the decedent employee about his conversion rights under his insurance policy. The court held that once the employee presented his predicament, Colonial Life had an affirmative obligation to provide complete and correct material information.

■ Allegedly, Dr. Paroski made similar inquiries regarding his life insurance policy. Woodhull apparently misrepresented to Dr. Paroski that his life insurance coverage was being maintained through BCS as long as it was paying the premiums. Dr. Paroski relied upon this representation and missed an opportunity to convert his group life insurance policy to an individual policy with John Hancock. Woodhull had a duty to provide him with correct and complete information. The issue of whether Woodhull misinformed Dr. Paroski is a question of fact. Therefore, Woodhull's motion to dismiss Fortune's Second Cause is denied.

**C. BCS Motion for Summary Judgment**
**1. *BCS Policy Clear and Unambiguous***

■ BCS argues that it is entitled to summary judgment on Fortune's Third

Cause of Action for denial of death benefits under the BCS policy because it is clear and unambiguous on its face. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue to as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court's function is not to resolve disputed genuine issues of material fact, but only to determine whether there is such an issue in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eastman Machine Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988). The mere existence of factual issues which are not material to the outcome of the litigation will not defeat a motion for summary judgment. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

■ The law on summary judgment pursuant to Rule 56 has particular importance where the parties dispute whether an insurance contract is ambiguous. A court may not grant summary judgment on an ambiguous policy while discovery is incomplete. *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1374 (E.D.N.Y.1988). Where the terms of a contract are ambiguous, the court must give the parties an opportunity to adduce extrinsic evidence of their intent. If the policy is unambiguous, its interpretation is a question of law for the court to decide. *Id.* at 1375. Therefore, the threshold question is whether the contract is ambiguous. *Id.* BCS asserts that it is entitled to summary judgment prior to discovery declaring that it has no obligation to pay Fortune under the policy because the policy is unambiguous. When determining whether the BCS policy is ambiguous, the Court must decide whether reasonable persons could differ as to the meaning. After reading the BCS policy, the Court finds it to be clear and unambiguous.[1] The BCS policy purchased by

1. In reviewing a claim under 29 U.S.C. § 1132(a)(1)(B) for denial of benefits under an

Woodhull became effective November 1, 1989. Section II A of the policy states that "the individuals eligible for insurance hereunder are shown on the Schedule of Benefits." BCS Exhibit ("Exh.") B. The Schedule of Benefits under Section V describes eligible individuals as follows:

> [E]mployees who have completed the waiting period *and* who are actively expending time and energy of at least 20* hours per week in the employ of the Employer (herein called employees with the eligible classes)....

BCS Exh. B (emphasis added). According to the policy, the waiting period is normally the first month following the date of employment. There is no waiting period for employees who are employed on the Date of Issue. The " *" refers readers to the Attached Addendum A which states under "Eligibility: (continued)" that "all Part-time Professional employees working at least 16 hours per week are eligible."

Dr. Paroski became disabled and unable to work in August 1989. As of November 1, 1989, the effective date of the BCS policy, Dr. Paroski was still employed by Woodhull. Therefore, Dr. Paroski was not required to complete the waiting period. Woodhull continued to list Dr. Paroski's status as "active" after he submitted his resignation as Director of Ambulatory Care on November 21, 1989. Although Dr. Paroski remained actively involved in Woodhull affairs after he became disabled, his participation was sporadic. Fortune concedes that Dr. Paroski never worked "more than 20 hours in any week after August, 1989," thus failing to meet the hours per week work requirement for eligibility. Fortune Affidavit ¶ 20.

Fortune has attempted to create an ambiguity by referring to the rider issued contemporaneously with the BCS policy which provides that:

> Coverage for Life Insurance may continue, for a maximum period equal to two times the Employee's total years of employment with the Employer less any period covered by a prior carrier.

Plaintiff opines that the most reasonable interpretation of this rider is that BCS was willing to offer continuation rights to already disabled employees, but wanted to receive credit for disability periods already offered by a prior carrier. This court disagrees. The rider modifies Paragraph 3. of Termination of Individual's Insurance of Section II Individuals. Section II individuals are those eligible for coverage. Therefore, the rider applies to *employees who have already been determined to be eligible for coverage.* The rider contains nothing to suggest that it applies to already disabled employees like Dr. Paroski. The relevant inquiry is whether Dr. Paroski is an eligible employee and as shown above, Dr. Paroski failed to satisfy the eligibility requirements of the BCS policy.

### 2. *Estoppel Claim*

Fortune argues that there are material issues of fact whether BCS should be estopped from asserting its defense of ineligibility for coverage. Although the Second Circuit has not expressly decided whether an insurer may be estopped from denying eligibility under ERISA, this Court believes that the doctrine of equitable estoppel may be available to the Plaintiff under the circumstances presented herein.[2]

---

insurance policy issued to an employer for the benefit of its employees, courts must apply a de novo standard of review. *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.,* 936 F.2d 98 (2d Cir.1991). The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch,* that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). As the BCS policy contains no provi-

sion giving it discretion to determine eligibility for benefits, the Court will review it *de novo.*

**2.** The application of the equitable estoppel doctrine in the ERISA context is not completely novel. Other courts have invoked the doctrine of equitable estoppel to enforce informal oral and written interpretations of an ambiguous ERISA plan. *See National Companies Health Benefit Plan v. St. Joseph's Hospital of Atlanta,* 929 F.2d 1558 (11th Cir.1991); *Kane v. Aetna Life Insurance,* 893 F.2d 1283 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990); *Lockrey v. Leavitt Tube*

The elements of equitable estoppel under federal common law are as follows:

> 1) the party to be estopped misrepresented material facts; 2) the party to be estopped was aware of the true facts; 3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; 4) the party asserting the estoppel did not know, nor should it have known, the true facts; and 5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*National Companies Health Benefit Plan v. St. Joseph's Hospital of Atlanta,* 929 F.2d at 1572 (11th Cir.1991) *citing Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); *see also City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42 (2d Cir.1988).

Other courts have addressed this issue and have held that insurers may be equitably estopped from denying coverage.[3] For example, in *Coleman v. Nationwide Life Insurance Co.,* 748 F.Supp. 429 (E.D.Va. 1990), an employee participated in a group health insurance plan provided by her husband's employer. The employer switched to Nationwide Life Insurance Company and agreed to pay 100% of the premiums due on the policy. The plaintiff made inquiries to Nationwide regarding her coverage. Nationwide and its cost containment organization advised the plaintiff that her hospitalization was approved. When plaintiff submitted her hospital bills for payment, Nationwide refused to pay because the employer had failed to pay the premiums after making the initial deposit. The court in *Coleman* held Nationwide liable under the principles of estoppel. It found that:

> First, the evidence clearly shows that Nationwide—through a letter and telephone conversations—represented to Coleman that her hospitalization expenses would be covered. It is undisput-

ed that Coleman reasonably relied on these representations, that she changed her position in reliance (i.e., by not switching coverage), and that she incurred a detriment as a result.

*Coleman,* at 433 (citations and footnote omitted).

Similarly, in *Swint v. Protective Life Insurance Co.,* 779 F.Supp. 532 (S.D.Ala. 1991), the court found that the insurer had waived its right to deny coverage and that it should be estopped from denying coverage. The insurer in *Swint* had initially represented that it would provide health insurance coverage for the plaintiff's stepson who had suffered a catastrophic injury. Then following further investigation the insurer terminated additional payments under the policy. The court found that the insurer had waived its right to deny coverage. It stated that:

> Where an insurer, with knowledge of facts vitiating a policy leads an insured to believe that he or she is protected under the policy, such acts, transactions, or declarations operate as a waiver of the forfeiture and preclude the insurer from relying thereon as a defense to a suit on the policy.

*Id.* at 560.

■ The Court believes that there are several material questions of fact as to whether BCS should be estopped from denying coverage. First, the December 20, 1989 letter from WTR to December reveals that December may have misrepresented to WTR that BCS would pick up employees who were disabled on the effective date of the BCS policy. This representation was conveyed to Dr. Paroski who may have died believing that BCS was providing him with life insurance coverage. Second, there is a material question of fact as to whether December acted as BCS's agent. Although December appears to be an employee of Blue Cross/Blue Shield and not BCS, he

---

*Employees' Profit Sharing Plan,* 766 F.Supp. 1510 (N.D.Ill.1991).

**3.** Courts have refused to estop trustees to pay benefits from an employee fund to an ineligible employee because the fund's actuarial sound-

ness is ultimately at stake. *See Seff v. Noitu Trust Fund,* 781 F.Supp. 1037 (S.D.N.Y.1992); *Saret v. Triform Corp.,* 662 F.Supp. 312 (N.D.Ill. 1986).

conducted all the negotiations with Woodhull's on behalf of BCS. Where there is a genuine issue of fact in regard to the scope of an agency relationship, it is inappropriate to grant summary judgment. *DiLorenzo v. Edward Holle Insurance Agency*, 735 F.Supp. 571, 575 (S.D.N.Y.1990).

### III. CONCLUSION

Accordingly, BCS's motion for summary judgment and Woodhull's motion to dismiss plaintiff's Second Cause of Action are denied. Woodhull's motion to dismiss plaintiff's First Cause of Action is hereby granted.

So Ordered.