**In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.**

**In re LTV STEEL COMPANY, INC., Debtor.**

**In re LTV STEEL TUBULAR PRODUCTS COMPANY, Debtor.**

**FRITO–LAY, INC., FL Holding, Inc. and Ainwick Corporation, Appellants and Cross–Appellees,**

v.

**The LTV CORPORATION, LTV Steel Company, Inc., LTV Steel Tubular Products Company, Appellees and Cross–Appellants.**

Nos. 89 Civ. 6687 (JES), 92 Civ. 2027 (JES), 92 Civ. 6010 (JES) and 92 Civ. 6011 (JES).

United States District Court, S.D. New York.

June 9, 1993.

Friedman, Wang & Bleiberg, P.C., New York City, for appellants and cross-appel-

lees (Arthur S. Friedman, Susan J. Schwartz, and Laurie R. Josephs, of counsel).

Shea & Gould, New York City, for appellants and cross-appellees (Martin I. Shelton, of counsel).

Davis, Polk & Wardwell, New York City, for appellees and cross-appellants (Guy Miller Struve, Bradley J. Butwin, Linda A. Ginsberg, and Karen V. Walker, of counsel).

Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellees and cross-appellants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Appellants and cross-appellees Frito–Lay, Inc., FL Holding, Inc. and Ainwick Corporation (collectively "Frito–Lay") and appellees and cross-appellants The LTV Corporation, for and on behalf of itself and the other debtors and debtors-in-possession herein (collectively "LTV" or "debtors") appeal from three orders of the United States Bankruptcy Court for the Southern District of New York (Lifland, Ch.J.) dated April 21, 1992 (the "Scheduling Order"), and dated July 1, 1992 and amended on July 2, 1992 which determined the amount of Frito–Lay's liquidated claims pursuant to section 502(b) of the Bankruptcy Code and estimated the allowed amount of Frito–Lay's contingent and unliquidated claims pursuant to section 502(c) of the Code (the "Final Order"). Frito–Lay also appeals from an earlier order entered by Judge Lifland dated February 18, 1992 which held, *inter alia,* that Frito–Lay's tort and quasi-contract claims were defective as a matter of law. For the reasons that follow, the orders appealed from are affirmed.

## BACKGROUND [1]

In 1981 and 1982, LTV and Frito–Lay entered into twenty-five tax benefit transfer agreements ("TBT Agreements") whereby LTV transferred to Frito–Lay the tax benefits associated with certain property to take advantage of provisions of the now repealed safe harbor leasing provisions of the Economic Recovery Tax Act of 1981 ("ERTA"), Pub.L. No. 97–34, 95 Stat. 172, *repealed by,* Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248, 96 Stat. 324, and temporary treasury regulations promulgated thereunder. *See* Temp.Treas.Reg. § 5c.168(f)(8)–1 to –8 (1992).

Under the TBT Agreements,[2] also known as safe harbor leases, LTV Steel's predecessors, Republic Steel Company ("Republic") and Jones & Laughlin Steel, Inc. ("J & L"), agreed to transfer the tax benefits from $520 million worth of LTV assets sold at their cost basis to Frito–Lay which leased them back for LTV's continued use. For a one-time cash payment and a promise to make regular installment payments, Frito–Lay received an exactly offsetting rental payment from LTV plus the property's tax benefits, *i.e.,* accelerated cost recovery system ("ACRS") deductions for the property's depreciation, an investment tax credit, and an energy tax credit. Over the life of the arrangement, LTV retained actual ownership rights in the property while Fri-

---

**1.** Except where otherwise indicated, the relevant facts are taken from the bankruptcy court's two earlier opinions. *See In re Chateaugay Corp.,* 102 B.R. 335 (Bankr.S.D.N.Y.1989); *In re Chateaugay Corp.,* 136 B.R. 79 (Bankr.S.D.N.Y. 1992).

**2.** It appears from the record that three TBT Agreements have been used below as representative of the twenty-five. Two of them, an October 12, 1982 agreement between Frito–Lay, Inc. and Republic Steel Company (the "Republic Agreement") and a November 12, 1981 agreement between Ainwick Corp. and Jones & Laughlin Steel, Inc. (the "J & L Agreement"), were used by the bankruptcy court in deciding the two summary judgment motions. A third, a November 6, 1981 agreement between Frito–Lay, Inc. and Republic Steel Company (the "Republic II Agreement"), was presented for purposes of the appeal of the Final Order. *See* Affidavit of Bradley J. Butwin sworn to June 8, 1992, ¶ 2. Although at Oral Argument counsel for LTV indicated that a fourth representative TBT Agreement was used, since that agreement has not been specifically identified the Court is constrained to rely on the three representative agreements noted above.

to–Lay was owner of the property for tax purposes only.

The TBT Agreements specifically deal with the probability that Frito–Lay's tax benefits might be lost because of a disqualifying event, *i.e.*, that the transferred assets would be disqualified from safe harbor treatment under ERTA. Where that occurred, the assets were deemed to be sold by the tax lessor (Frito–Lay) to the tax lessee (LTV), resulting, in this case, in Frito–Lay's recognition of income in an amount equal to the principal outstanding on its installment payment obligation. *See* Temp.Treas.Reg. § 5c.168(f)(8)–8(d). The TBT Agreements also imposed an indemnity obligation on LTV with respect to tax costs incurred by Frito–Lay as a consequence of a disqualifying event.

On July 17, 1986, LTV filed the first of its voluntary petitions under Chapter 11 of the Bankruptcy Code, subsequent to which, in response to a downturn in the fortunes of the domestic steel industry, it "retired"[3] certain TBT assets at several facilities in 1987. Although the applicable temporary treasury regulation reserved on the question as to whether those retirements of unprofitable TBT assets during that period of restructuring were disqualifying events, *see* Temp.Treas.Reg. § 5c.168(f)(8)–8(b)(9),[4] LTV nevertheless applied the tax deductions associated with that retired property to reduce its 1987 tax liability. Frito–Lay, believing that it could not also use those tax benefits, paid approximately $14 million in taxes based upon the retirement of those assets. *See* Affidavit of Mark Kreger sworn to June 9, 1992, ¶ 15. Frito–Lay then filed claims in the bankruptcy court against LTV for indemnification under the TBT Agreements and claims sounding in tort and quasi-contract for improper appropriation of tax benefits belonging to Frito–Lay.

Frito–Lay sought an administrative priority for that post-petition conduct, claiming that LTV's post-petition decision to appropriate the aforesaid tax benefits entitled them to that priority. The debtors filed objections to Frito–Lay's proofs of claims, and moved for partial summary judgment seeking a determination that the TBT Agreements relating to assets at LTV Steel's Buffalo, New York facility did not constitute executory contracts or unexpired leases under section 365 of the Bankruptcy Code and that Frito–Lay's indemnity loss claims were pre-petition general unsecured claims not entitled to an administrative priority under sections 503 and 507 of the Bankruptcy Code. On June 29, 1989, the bankruptcy court granted that motion. *See In re Chateaugay Corp.*, 102 B.R. 335 (Bankr.S.D.N.Y.1989) (hereinafter *"Chateaugay I"*), *aff'd*, No. 89 Civ. 6687 (S.D.N.Y. Mar. 29, 1990).

By Order dated March 29, 1990, for reasons expressed on the record on March 23, 1990, this Court affirmed that decision of the bankruptcy court.[5] The debtors subsequently moved for summary judgment seeking a determination that that holding applied to the rest of the TBT Agreements. LTV also moved for summary judgment and Frito–Lay cross-moved for partial summary judgment with respect to the issue of the debtors's liability on Frito–Lay's tort and quasi-contract claims. By order dated February 18, 1992, following a decision is-

---

**3.** Retirements are defined as the permanent withdrawal of the qualified tax benefit property from use in the business or in the production of income. *See* Treas.Reg. § 1.167(a)–8(a) (1992).

**4.** Temp.Treas.Reg. § 5c.168(f)(8)–8 states:

(b) *Events which cause an agreement to cease to be characterized as a lease.*
A disqualifying event shall cause an agreement to cease to be treated as a lease under section 168(f)(8) as of the date of the disqualifying event. A disqualifying event shall include the following:

 (9) Retirements and casualties. [Reserved]

**5.** By Order dated July 31, 1992, this Court, mindful of the fact that the bankruptcy court had recently issued its Final Order which would soon be appealed to the district court, denied Frito–Lay's motion for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) of the Court's March 29, 1990 decision, entered over two years earlier.

sued on January 16, 1992 as amended by an errata notice dated February 14, 1992,[6] the bankruptcy court granted LTV's motion for summary judgment and denied Frito–Lay's cross-motion for partial summary judgment, ruling that the tort and quasi-contract claims were insufficient as a matter of law. *See In re Chateaugay Corp.*, 136 B.R. 79 (Bankr.S.D.N.Y.1992) (hereinafter *"Chateaugay II"*). Frito–Lay appealed that decision, and this Court, in the interests of judicial efficiency, deferred any ruling on the merits of that appeal until after the bankruptcy court had issued its final order.

Thereafter, the debtors moved for a hearing to determine the allowed amount of Frito–Lay's fixed claims and to estimate their contingent, unliquidated claims. *See, e.g., In re Baldwin–United Corp.*, 55 B.R. 885, 896–902 (Bankr.S.D.Ohio 1985). The bankruptcy court granted that motion and, in its Scheduling Order, scheduled limited discovery for the purpose of that hearing. *See* Bankruptcy Court Order dated April 21, 1992.

After that hearing, the bankruptcy court entered its Final Order, dated July 2, 1992, in accordance with an oral opinion given on June 17, 1992, which established the allowed amount of Frito–Lay's fixed claims, *i.e.*, claims based either on the *ab initio* failure of certain TBT assets to qualify for anticipated energy or other tax credits from the time of acquisition (the *"ab initio* claims"), or on other undisputed disqualifications. The bankruptcy court also estimated Frito–Lay's contingent claims, *i.e.*, claims based on either past or future retirements of TBT assets which have yet to be finally determined to be disqualifying events as required by the TBT Agreements. The bankruptcy court estimated the contingent claims at 80% because of the strong probability that they would be so determined. The bankruptcy court also de-

clined to award Frito–Lay post-petition interest, and declared that Frito–Lay is not entitled to a gross-up for taxes owed on indemnification payments received on its *ab initio* claims. *See* Final Order, Ex. C at 92–101. In total, the bankruptcy court allowed $39,625,284 of Frito–Lay's claim.[7] *See* Final Order at 3–4 & Ex. D. Frito–Lay appeals these specific determinations as well as certain discovery rulings.

LTV cross-appeals from the Final Order. They argue (1) that the bankruptcy court should have estimated at 20%, not 80%, the likelihood that LTV's retirements of TBT assets will be finally determined to be disqualifying events, (2) that the TBT Agreements do not require LTV to indemnify Frito–Lay for state and local taxes owed as a result of receiving indemnity payments, and (3) that the TBT Agreements require that stipulated indemnity loss schedules be used wherever Frito–Lay suffered a loss of all tax benefits remaining as of the time of a complete disqualification. The bankruptcy court held that those schedules should only be used where Frito–Lay's loss resulted from an *ab initio* failure of a TBT asset to qualify for all tax benefits.

In this memorandum opinion, the Court reiterates its ruling on Frito–Lay's prior appeal of the bankruptcy court's June 29, 1989 order, and addresses the issues raised by the parties's appeals from the February 18, 1992 order, the April 21, 1992 Scheduling Order, and the July 2, 1992 Final Order.

## DISCUSSION

■ The Court has appellate jurisdiction over these matters pursuant to 28 U.S.C. § 158(a), and reviews the bankruptcy court's conclusions of law *de novo*. The bankruptcy court's interpretations of the TBT Agreements, to the extent they are clear and unambiguous, are likewise re-

---

**6.** The bankruptcy court's decision granting partial summary judgment had originally omitted discussion and resolution of Frito–Lay's fraud claim, but subsequently corrected that oversight by that errata notice.

**7.** Frito–Lay had sought greater than $55 million. *See* Frito–Lay's Resp. in Opp'n to "Supplemental

Mot. by Debtors Further Objecting to Allowance of Frito–Lay's TBT Claims" dated April 6, 1992, at 6, 8. LTV, by contrast, had sought a ruling that the allowable amount of Frito–Lay's claim was only a little more than $19 million. *See* Affidavit of B. Robert Crowley sworn to June 8, 1992, Ex. A.

viewed *de novo. See Seiden Assocs. v. ANC Holdings*, 959 F.2d 425, 428–29 (2d Cir.1992). *But see infra* pp. 404–405.

## I. THE JUNE 29, 1989 ORDER

█ In its June 29, 1989 order, the bankruptcy court held that the TBT Agreements were neither executory contracts nor unexpired leases, and that Frito–Lay was therefore not entitled to an administrative priority for claims arising thereunder. On March 23, 1990, this Court affirmed that decision for the reasons set forth in its oral ruling and adheres to that decision on this appeal of the Final Order of the bankruptcy court.

█ Frito–Lay had argued that LTV's use of the tax benefits from qualified TBT property "sold" to Frito–Lay was a benefit to LTV conferred post-petition. The Court rejected, and continues to reject, that argument not only because LTV's obligation to indemnify Frito–Lay for its loss of those benefits was undertaken and existed prepetition, but also because the Bankruptcy Code confers an administrative priority only when a debtor, by electing post-petition not to disaffirm an executory contract or unexpired lease, induces a creditor to confer a post-petition benefit upon the estate. Here, the debtors did not induce Frito–Lay to confer any such benefit, but rather appropriated to themselves whatever benefits they received.[8] *See Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986); *In re Jartran, Inc.*, 732 F.2d 584, 586–89

(7th Cir.1984); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976).

## II. THE TORT AND QUASI–CONTRACT CLAIMS

Frito–Lay also appeals from the bankruptcy court's order dated February 18, 1992, dismissing four claims based on LTV's post-petition retirement of other TBT assets, specifically those at LTV Steel's Buffalo and Aliquippa, Pennsylvania facilities. Frito–Lay claims that those retirements constituted a conversion of its tax benefits, caused an unjust enrichment to LTV, were an unauthorized abandonment and/or use of the property by LTV under sections 554 and 363 of the Bankruptcy Code in breach of LTV's fiduciary duties, and, finally, were not retirements but misrepresentations causing Frito–Lay to pay additional taxes in reliance thereon.[9]

█ All of these contentions lack merit. Although denominated by Frito–Lay as non-indemnity claims, the tort and quasi-contract claims, however labeled, are in essence claims based upon the contracts since they seek to recover tax benefits allegedly lost by Frito–Lay when LTV "retired" certain TBT assets in 1987. The TBT Agreements specifically created a contractual obligation to indemnify Frito–Lay for lost tax benefits caused by LTV's conduct resulting in a loss of such benefits. Since the parties bargained for those indemnity provisions, these inaptly named non-indemnity claims simply recharacterize what are, in reality, nothing more than indemnity claims arising out of a breach of

---

**8.** It is also significant to note that since virtually all material obligations of both parties were in effect performed at the time that these agreements were made, they lacked the indicia of true executory contracts, *i.e.*, substantial obligations to be performed by both contracting parties after the execution of the contract. Moreover, the mere fact that LTV breached the contract post-petition is not in itself sufficient to entitle Frito–Lay to an administrative priority. Indeed, all disaffirmed pre-petition obligations are in effect post-petition breaches which discharge the post-petition performance obligations of the other contracting party, except, as noted above, where the debtor affirms the contract and thus induces performance by that party for the benefit of the estate. The fact that a pre-petition contract is breached or "disaf-

firmed" post-petition has never affected the dischargeability of a pre-petition obligation or been in itself sufficient to entitle the other contracting party to an administrative priority. *Cf. In re Chateaugay Corp.*, 112 B.R. 513, 520–21 (S.D.N.Y.1990), *aff'd*, 944 F.2d 997 (2d Cir.1991).

**9.** The Court notes, without deciding, that while Frito–Lay might be entitled to an administrative priority for any recovery on its tort claims against LTV, *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), that issue is moot since, for the reasons set forth *infra,* those claims were properly dismissed. *See In re CIS Corp.*, 142 B.R. 640 (Bankr. S.D.N.Y.1992).

contract. As such, under New York law, which the parties do not dispute applies here, they cannot give rise to a tort action in the absence of additional allegations of wrongdoing. *See, e.g., Matzan v. Eastman Kodak Co.,* 134 A.D.2d 863, 521 N.Y.S.2d 917, 918 (4th Dep't 1987); *Burlew v. American Mut. Ins. Co.,* 99 A.D.2d 11, 471 N.Y.S.2d 908, 912–13 (4th Dep't), *aff'd,* 63 N.Y.2d 412, 482 N.Y.S.2d 720, 472 N.E.2d 682 (1984).

▮▮▮ For the same reason, since Frito–Lay's conversion claims seek the same damages for precisely the same conduct, they also were properly dismissed. *See, e.g., Hutton v. Klabal,* 726 F.Supp. 67, 72 (S.D.N.Y.1989); *Fraser v. Doubleday & Co., Inc.,* 587 F.Supp. 1284, 1288 (S.D.N.Y. 1984); *Peters Griffin Woodward, Inc. v. WCSC, Inc.,* 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (1st Dep't 1982).[10] Moreover, the quasi-contract claims are also legally insufficient because New York law does not permit recovery for unjust enrichment where, as here, an express contract covers the same subject matter for which that relief is sought.[11] *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 48 (2d Cir.1988); *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388–89, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987).

▮▮▮ With respect to Frito–Lay's fraud claims, New York courts have held that a cause of action for fraud is legally insufficient when the fraud charged relates to a breach of contract and does not claim special, non-contract damages. *See Tesoro Petroleum Corp. v. Holborn Oil Co.,* 108 A.D.2d 607, 484 N.Y.S.2d 834, 835 (1st Dep't), *appeal dismissed,* 65 N.Y.2d 637 (1985); *Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 213 (S.D.N.Y. 1991); *Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 582 (S.D.N.Y.1989); *see generally Brick v. Cohn–Hall–Marx Co.,* 276 N.Y. 259, 263–64, 11 N.E.2d 902 (1937). To the extent that the retirements, proper or otherwise, deprived Frito–Lay of contractually bargained for tax benefits, those damages are recoverable under the specific terms of the contracts. Frito–Lay has alleged no other damages.[12]

**10.** In any event, Frito–Lay cannot show legal ownership or a superior right to possession of specifically identifiable property which is required for a conversion claim. *See, e.g., Aetna Casualty & Sur. Co. v. Glass,* 75 A.D.2d 786, 428 N.Y.S.2d 246, 247 (1st Dep't 1980); *Rodgers v. Roulette Records, Inc.,* 677 F.Supp. 731, 736–37 (S.D.N.Y.1988); *Cantor v. Anderson,* 639 F.Supp. 364, 369 (S.D.N.Y.), *aff'd,* 833 F.2d 1002 (2d Cir.1986). Indeed, the TBT Agreements specifically state that the debtors retained all ownership rights in the properties. *See* Republic Agreement § 7.01; J & L Agreement § 2.4. Moreover, New York law does not recognize conversion of intangible property rights unless merged in, or identified with, some document, or unless those rights relate to specifically identifiable money. *See, e.g., Sporn v. MCA Records, Inc.,* 58 N.Y.2d 482, 489, 462 N.Y.S.2d 413, 448 N.E.2d 1324 (1983); *Ippolito v. Lennon,* 150 A.D.2d 300, 542 N.Y.S.2d 3, 6 (1st Dep't 1989); *Matzan, supra,* 521 N.Y.S.2d at 918; *Independence Discount Corp. v. Bressner,* 47 A.D.2d 756, 365 N.Y.S.2d 44, 46 (2d Dep't 1975); *Pioneer Commercial Funding Corp. v. United Airlines,* 122 B.R. 871, 884–85 (S.D.N.Y.1991). Here, the allegedly converted tax benefits are neither identified with any documents which have been converted, nor are they earmarked for payment with specific monies. *See* Republic Agreement § 9.02(b)(ii); J & L Agreement §§ 8.3, 8.4.

**11.** Frito–Lay relies on *In re THC Fin. Corp.,* 686 F.2d 799 (9th Cir.1982) where the court reversed a bankruptcy court's ruling that a creditor's unjust enrichment claim was barred simply because its indemnification claim had been barred as untimely filed. However, in that case the Court limited its inquiry to the timeliness of the claim and specifically recognized that the unjust enrichment claim might have no merit in light of the express contract. Moreover, in the other cases cited in Frito–Lay's brief which permitted unjust enrichment claims for benefits conferred to a debtor no express contract existed. *See, e.g., In re Auto Dealer Servs., Inc.,* 110 B.R. 68 (Bankr.M.D.Fla.1990) (executory contract rejected by debtor). They are, therefore, legally and factually inapposite here.

**12.** In any event, Frito–Lay cannot prove the requisite element of justifiable reliance. *See Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir.1989); *Channel Master Corp. v. Aluminum Ltd. Sales,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958). Frito–Lay alludes to certain documents which purport to show that certain TBT property was abandoned or demolished, and thus retired, at a later date than represented by LTV to support its claim that it detrimentally relied on LTV's misrepresentations that that property was retired at an earlier date thus causing Frito–Lay to forego tax benefits available for the years prior

■ Finally, with respect to its claims for breach of fiduciary duty, Frito–Lay argues that LTV's post-petition retirement of TBT property was an unauthorized abandonment pursuant to section 554 of the Bankruptcy Code, or an unauthorized use under section 363. However, as the bankruptcy court correctly noted, "abandonment" of property within the meaning of section 554 has been interpreted to mean its release from the estate. *See Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 508, 106 S.Ct. 755, 763, 88 L.Ed.2d 859 (1986) (Rehnquist, J., dissenting). Frito–Lay has presented no evidence to support its claim that there was such an abandonment other than some internal documents of LTV, which describe their own treatment of the TBT property as "abandoned" for tax purposes. However, the fact that LTV in its internal documents described the TBT property as "abandoned" *for tax purposes* does not support a rational inference of abandonment within the meaning of section 554.[13] This is especially true since Frito–Lay did not present any evidence that LTV had released that property from the estate. It follows that the bankruptcy court correctly concluded that the retirement of the TBT properties at issue did not require either notice or a hearing. *See* 11 U.S.C. § 554(a) (1988).

■ Frito–Lay's contention that LTV breached it fiduciary duties by its unauthorized use of the property within the meaning of section 363 of the Bankruptcy Code is, of course, inconsistent with its simultaneous claim that the property had been retired. Since retirement is, by definition, a withdrawal from use, *see* Treas.Reg. § 1.167(a)–8(a), common sense militates against a finding that LTV used the prop-

erty which Frito–Lay claims that it abandoned.

## III. DISCOVERY

■ Frito–Lay argues that the bankruptcy court failed to rule on a material discovery dispute involving claims of privilege before granting summary judgment. There is no merit to this claim. The parties had stipulated to additional discovery and agreed to submit documents for *in camera* review to the extent that any privileges were asserted. Since the bankruptcy court had informed the parties that it would disclose to Frito–Lay only those documents as to which it had overruled assertions of privilege, it is clear that the Court had in fact ruled when it sustained the claims of privilege with respect to those documents that were not in fact disclosed.

■ Discovery matters, in any event, lie within a court's discretion, *see generally Belfiore v. New York Times Co.,* 826 F.2d 177, 183 (2d Cir.1987), *cert. denied,* 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988); *Baker v. F & F Inv.,* 470 F.2d 778, 781 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973), and no abuse of that discretion can be found where, as here, there is no showing that a different ruling would have altered the outcome, *see In re CIS Corp.,* No. 91 Civ. 6075, 1991 WL 253777, at *5, 1991 U.S.Dist. LEXIS 16686, at *4 (S.D.N.Y. Nov. 19, 1991), or that fundamental unfairness or violation of a substantial right resulted from a discovery ruling. *See In re Integrated Resources,* 147 B.R. 650, 664 (S.D.N.Y.1992) (citing *Public Loan Co. v. FDIC,* 803 F.2d 82, 86 (3d Cir.1986)). This is especially true since Frito–Lay failed to file an affidavit detailing the nature of the materials sought, their relevancy, and how they could be

to its actual retirement. However, since the TBT Agreements specifically provide that a retirement cannot constitute a disqualifying event absent a final determination to that effect, Frito–Lay could not have reasonably relied on any alleged representations by LTV that a disqualifying event had occurred in the absence of a final determination that any alleged retirement constituted a disqualifying event.

**13.** Treasury regulations state that "the term 'retirement' means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income ... [which] *may* be made ... by actual abandonment." *See* Treas.Reg. § 1.167(a)–8(a) (emphasis added). That definition in itself demonstrates that retirements for tax purposes are not synonymous with abandonments.

expected to raise an issue of fact. *See* Fed.R.Civ.P. 56(f); *Belfiore, supra,* 826 F.2d at 184; *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926–27 (2d Cir.1985).[14]

## IV. ESTIMATION

Frito–Lay challenges three aspects of the Final Order. Frito–Lay first argues that the bankruptcy court incorrectly determined that the past and future indemnity claims based on LTV's retirement of TBT property are contingent rather than fixed claims. Frito–Lay also appeals from the bankruptcy court's decision denying Frito–Lay both a gross-up (*i.e.,* an increase in the indemnity payment to cover taxes owed on the indemnity to be paid to cover the lost tax benefits) for taxes owed as a result of the failure *ab initio* of certain TBT assets to qualify for tax benefits and interest owed on those overdue taxes.

 Frito–Lay's argument that the claims based on retirements should have been allowed as fixed, not contingent,

claims lacks merit. The three representative TBT Agreements clearly indicate that these claims are not fixed since under the clear terms of the agreements LTV has no duty to indemnify until there has been a final determination that Frito–Lay has lost tax benefits for which it is entitled to an indemnity. *See* Republic Agreement § 9.02(b)(iv); J & L Agreement §§ 8.2, 8.5(d); Republic II Agreement § 9.02(b)(iv). According to the agreements, a final determination can be established by an unappealable final judgment or decree by either a court or taxing authority, or by an agreement either between Frito–Lay and LTV or between one of the two and a taxing authority.[15] *See* Republic Agreement, Art. I; J & L Agreement § 8.5(d); Republic II Agreement, Art. I. Therefore, since the retirements on which the claims are based have not yet been finally determined to disqualify Frito–Lay from using the tax benefits, Frito–Lay's claims are contingent on the likelihood that they will be so determined. It follows that the bankruptcy court correctly subjected those claims to

**14.** Frito–Lay contends that the bankruptcy court did not afford Frito–Lay the two day notice of settlement required by Local Bankruptcy Rule 17 for all nonconsensual orders before it signed LTV's proposed Scheduling Order. However, that circumstance is of no consequence here. Frito–Lay responded to the bankruptcy court's entry of LTV's proposed order by submitting a counter-order with a three-page letter airing its complaints. Thereafter, the bankruptcy court opted not to sign the counter order nor to vacate the original order nor to combine aspects of the two. It is clear therefore that the bankruptcy court carefully considered Frito–Lay's counter-order and adhered to its original order.

Frito–Lay has likewise shown no prejudice resulting from the limited discovery afforded in connection with the estimation hearing. The bankruptcy court permitted a large amount of evidence to be offered at the hearing which had been accumulated by the parties over the course of approximately five years of discovery and litigation under relaxed rules of evidence. *See* Transcript of Estimation Hearing dated June 17, 1992 at 13–14; *In re Baldwin–United, supra,* 55 B.R. at 899, 911–12. Furthermore, there is no merit to Frito–Lay's contention that the bankruptcy court unfairly limited discovery. Frito–Lay's request to depose LTV's Director of Taxes, Debra Kirkham, though she had been deposed twice previously, was granted, not denied, by the bankruptcy court. However, because she

was travelling at the time, the bankruptcy court ordered that the deposition take place only if she was in the tri-state area before the hearing. Moreover, LTV's requested prior tax returns were produced. *See* LTV's Memorandum of Law dated October 9, 1992, at 24, n. 29; Debtors's Responses and Objections to Frito–Lay's Document Requests, Interrogatories and Deposition Notice in Connection with Estimation Hearing dated April 21, 1992, at 4.

Finally, the fact that the I.R.S. declined to issue a ruling requested by LTV that retirements of TBT assets were not disqualifying events was disclosed in LTV's pre-hearing memorandum, and thus was part of the record that the bankruptcy court considered before estimating Frito–Lay's indemnity retirement claims at 80% rather than at 20% as requested by LTV.

**15.** Frito–Lay's argument that it had a *de facto* agreement with LTV has no substance. There is no evidence that the two parties reached any agreement that the 1987 retirements are disqualifying events. The Court rejects as unpersuasive Frito–Lay's contention that the parties's consistent treatment of the 1987 retirements as disqualifying events established such an agreement, especially since Frito–Lay also asserts that it was compelled to treat the retirements as disqualifications, a position altogether inconsistent with any alleged agreement with LTV to do so.

estimation.[16]

■ Nor can this Court, mindful of the bankruptcy court's broad discretion as to estimation matters, *see In re Corey*, 892 F.2d 829, 834 (9th Cir.1989), *cert. denied sub nom. Kulalani Ltd. v. Corey*, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990); *In re Brints Cotton Mktg.*, 737 F.2d 1338, 1341 (5th Cir.1984); *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 136 (3d Cir.1982), conclude that the estimate made by the bankruptcy court was erroneous.

In its Final Order, the bankruptcy court listed the factors it considered which strongly support its finding that there was an 80% likelihood that Frito–Lay's claims based on LTV's retirement of TBT property would be determined to be disqualifications entitled to an indemnity. The record makes clear that the bankruptcy court relied on LTV's prior inconsistent treatment of the retirements as disqualifications on its 1987 tax return where it utilized the tax benefits from the retired property. In addition, the bankruptcy court considered the legislative history of the relevant statute, the applicable regulation, and its own prior determination in *Chateaugay II* that retirements are disqualifications under certain circumstances. In light of those facts, Judge Lifland's choice of 80% accords with the high likelihood that the retirements will

be determined to be disqualifications and, as such, was a proper exercise of discretion. It follows that the Court must reject LTV's argument on its cross-appeal that the contingent claims should have been estimated at 20%.

■ Next, Frito–Lay complains that the bankruptcy court erred when it did not permit Frito–Lay to recover for interest on anticipated taxes owed as a result of the failure *ab initio* of certain TBT assets to yield expected tax benefits. However, since the tax benefits bargained for were not available at the time the agreements were entered, any tax owing by Frito–Lay with respect to those lost tax benefits was clearly owed pre-petition. It follows that any claims for indemnification based on those lost tax benefits and interest thereon was properly limited to pre-petition interest, since, as the bankruptcy court correctly found, 11 U.S.C. § 502(b)(2) bars post-petition interest on a pre-petition unsecured claim.[17] *See* 11 U.S.C. § 502(b)(2) (1988); *United Savings Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 372–73, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988). *See also In re Petite Auberge Village, Inc.*, 650 F.2d 192 (9th Cir.1981); *In re Del Mission Ltd.*, 116 B.R. 734, 736 (Bankr. S.D.Cal.1990), *aff'd*, 130 B.R. 362 (9th Cir.

16. The fact that Frito–Lay elected to pay the taxes does not, as Frito–Lay contends, establish that these claims are fixed. Nor is LTV equitably estopped from contending that Frito–Lay's claims are not fixed by the fact that LTV at first took the position that the 1987 retirements were disqualifying events, and has since abandoned that position. The application of the concept of equitable estoppel lies in a court's sound discretion which, for the reasons that follow, was properly exercised here. *See, e.g., Societe Generale v. Federal Ins. Co.*, 856 F.2d 461, 467 (2d Cir.1988).

Although Frito–Lay argues that it detrimentally relied on LTV's now abandoned position referred to above, it cannot prove, as it must, that its reliance was reasonable. *See City of Yonkers v. Otis Elevator Co., supra*, 844 F.2d at 48. In light of contractual provisions requiring, in this case, a final determination as to what constitutes a disqualifying event, and further provisions stating that the parties should not treat retirements as disqualifications, *see* Republic Agreement §§ 9.02(b)(iv), 10.01; J & L Agree-

ment § 8.5(d); Republic II Agreement §§ 9.02(b)(iv), 10.01, Frito–Lay could not have reasonably relied on LTV's unilateral decision to appropriate the post-retirement tax benefits in 1987 especially since Frito–Lay, represented by competent counsel, clearly had means to ascertain if in fact a disqualifying event had occurred. *See Heckler v. Community Health Servs.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); *Fortune v. Medical Assocs. of Woodhull, P.C.*, 803 F.Supp. 636, 643 (E.D.N.Y. 1992). In any case, estoppel applies only to factual, not legal misrepresentations. *See, e.g., Lignos v. United States*, 439 F.2d 1365, 1368 (2d Cir.1971); *Corning Glass Works v. Southern New England Tel.*, 674 F.Supp. 999, 1012 (W.D.N.Y.), *aff'd per curiam*, 835 F.2d 451 (2d Cir.1987).

17. *In re Hopkins*, 131 B.R. 308 (Bankr.N.D.Tex. 1991), relied on by Frito–Lay is clearly inapposite. That case involved a claim for interest on a non-dischargeable tax owed by a debtor to the I.R.S. under 11 U.S.C. § 507(a)(7)(A)(iii) which has no relevance here to a claim for interest on a tax owed by a creditor.

BAP 1991); *In re Healis,* 49 B.R. 939, 942 (Bankr.M.D.Pa.1985).

 It is also clear that Judge Lifland was correct in denying Frito–Lay a gross-up based upon income taxes that would be owing on the indemnity payments it received for loss of its tax benefits. To the extent that Frito–Lay *ab initio* lost the benefit of the tax benefits bargained for and was indemnified for that loss by LTV, that indemnity was clearly a return of a portion of its purchase price, and, as a return of capital, did not constitute taxable income to Frito–Lay which entitled it to any gross-up.[18]

## V. CROSS–APPEAL

On its cross-appeal, LTV raises three issues: (1) that the TBT Agreements should have been interpreted to permit Frito–Lay a gross-up only for federal taxes and not for state and local taxes with respect to tax benefits that were not lost *ab initio;* (2) that the bankruptcy court misread provisions in the TBT Agreements for the application of either indemnity schedules or indemnity formulae to calculate the indemnity amounts owed by LTV, and (3) that, as discussed above, *see supra* p. 403, that Frito–Lay's indemnity claims should have been estimated at 20% of the amount requested.

LTV predicates its argument that the bankruptcy court erred in awarding compensation to Frito–Lay for both state and local as well as federal taxes with respect to indemnities owed by LTV for tax benefits not lost *ab initio* by Frito–Lay on the language of certain TBT Agreements which refer to Frito–Lay's liability "under the [Internal Revenue] Code." *See* Republic Agreement § 9.02(b)(ii); Republic II Agreement § 9.02(b)(ii). However, those TBT Agreements also state that for any

singular loss the lessee (LTV) shall pay the lessor (Frito–Lay) for "taxes" in the plural, and others refer to "federal, state and local taxes imposed on" any indemnification payment. *See* J & L Agreement § 8.5(a). It is clear therefore that the language of the TBT Agreements in this regard is certainly subject to differing rational interpretations.

The same is true with respect to the provisions of the contracts relating to the use of written indemnification formulae and/or stipulated loss schedules.[19] The TBT Agreements state that when all tax benefits have been disqualified the indemnity payment shall equal the original purchase price multiplied by a percentage listed in certain schedules and, alternatively, that when less than all tax benefits have been disqualified the indemnity be calculated according to the formulae set forth in the agreements. LTV reads those provisions to require the use of the schedules when all types of tax benefits are disqualified (*i.e.,* ACRS depreciation, energy tax credit, or investment tax credit), and the formulae when less than all three are disqualified. The bankruptcy court, however, interpreted those provisions to require application of the schedules where tax benefits were disqualified *ab initio* and therefore unavailable over the full course of the leases. Judge Lifland applied the formulae only when disqualifications occurred after Frito–Lay had utilized at least some of the tax benefits offered under the leases.

 It is clear, as noted above, *see supra* p. 398, that where the terms of a contract are unambiguous, the interpretation of the contract is a matter of law subject to *de novo* review. *See Seiden Assocs. v. ANC Holdings, supra,* 959 F.2d at 429. It is not so clear that that standard applies where, as here, the provisions of the contract are subject to more than one

---

**18.** The Court does not find persuasive the fact that the I.R.S. withdrew a private letter ruling which denied a gross-up for an indemnity payment which restored an indemnitee to his prior position. That action does not permit any rational inference that the I.R.S. has either abandoned the position expressed in that private letter ruling or that the I.R.S. has adopted a contrary position.

**19.** It should also be noted that the bankruptcy court was not fully presented with this argument, therefore, it may not be properly raised on this appeal. *See In re Bona,* 124 B.R. 11, 16 (S.D.N.Y.1991); *see generally Kraebel v. New York City Dep't of Hous. Preservation & Dev.,* 959 F.2d 395, 401 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 245 (1992).

rational interpretation, and the parties have submitted no extrinsic evidence to assist the Court in resolving those contractual ambiguities. In that situation there has been disagreement as to whether the issue should be regarded as a mixed question of law and fact, or purely a matter of law as to which a reviewing court can reach its own determination. *See Antilles Steamship Co. v. Members of the Am. Hull Ins. Syndicate*, 733 F.2d 195 (2d Cir.1984); *id.* at 202–07 (Newman, J., concurring).[20]

 Tested by either a clearly erroneous standard or a *de novo* standard, the Court concludes that the decision of the bankruptcy court should be affirmed. The use of the plural "taxes" and the reference to state and local taxes suggests strongly that both state and local taxes were to be indemnified. Similarly, the requirement that the schedules be used only when all tax benefits are lost leads to the rational conclusion that the formulae should be used only when some tax benefits have been obtained. Since the only time all tax benefits are lost is when they are lost *ab initio* the Court finds the bankruptcy court's interpretation to be correct and more consistent with the language of the contract than LTV's more strained construction.

### CONCLUSION

Accordingly, for the reasons stated above, the orders appealed from are affirmed. The Clerk of Court is directed to close the above-captioned actions.

It is **SO ORDERED.**

---

**20.** This issue is further complicated by the fact that *Antilles* was decided before the 1985 Amendment to the Federal Rules of Civil Procedure which amended Rule 52(a) to apply a clearly erroneous standard of review to fact findings made on the basis of documentary evidence which are clearly not based on demeanor or credibility evaluations. *See* Fed.R.Civ.P. 52 advisory committee's note, 1985 Amendment (noting that despite the fact that an appellate court has equal ability to evaluate "documentary proof and the drawing of inferences from it, thus eliminating the need for any special deference to the trial court's findings ... [that consideration is] outweighed by the public interest in the stability and judicial economy that would be promoted by recognizing that the trial court, not the appellate tribunal, should be the finder of the facts[,]" and further noting the policy against appellate retrial of factual issues and needless reallocation of judicial authority). That Amendment was made specifically applicable to Bankruptcy Rule 8013 in 1987, which LTV concedes applies here. *See* Bankruptcy Rule 8013 advisory committee's note, 1987 Amendment.