**Rohit PHANSALKAR, Plaintiff,**

v.

**ANDERSEN WEINROTH & CO., L.P., AW & Co., Inc., G. Chris Andersen, and Stephen D. Weinroth, Defendants.**

**No. 00 Civ. 7872 SAS.**

United States District Court,
S.D. New York.

Aug. 28, 2001.

Andrew J. Rossman, Samidh Guha, Sapna Mirchandani, Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York, New York, for Plaintiff.

Jaculin Aaron, Daniel Schimmel, Shearman & Sterling, New York, New York, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

This case involves a complex dispute between Plaintiff Rohit Phansalkar and Defendants Andersen Weinroth & Co., L.P., AW & Co., Inc., G. Chris Andersen and Stephen D. Weinroth (collectively "AW"). The parties have alleged several claims against each other based on transactions that took place during Phansalkar's employment at AW. This motion involves just one of Phansalkar's many claims against AW. In Count Fifteen of his Amended Complaint, Phansalkar alleges that AW illegally converted his shares in a company called Millenium Cell Inc. ("MCEL"). AW moves pursuant to Rule 56(c) of the Federal Rules of Civil Procedure for partial summary judgment dismissing this count. For the reasons stated below, AW's motion is denied.

## I. SUMMARY JUDGMENT STANDARD

Rule 56 provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law[,]' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). However, the non-moving party may not "rest upon ... mere allegations or denials." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir.1999), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2688,

147 L.Ed.2d 960 (2000); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations, and alterations omitted).

## II. BACKGROUND

Anderson Weinroth & Co., L.P., is an investment banking firm. G. Chris Anderson and Stephen D. Weinroth are partners at this firm. Rohit Phansalkar was an investment banker at the firm from February 1998 until July 2000.[1]

Phansalkar alleges that AW wrongfully withheld compensation, certain securities and certain investment opportunities that were promised to him in exchange for the services he provided during his tenure with AW. Phansalkar also alleges that Anderson and Weinroth breached their agreement to sell him certain shares of stock in MCEL which are now worth several million dollars. Phansalkar's complaint includes claims for breach of contract, conversion, breach of fiduciary duty, quantum meruit, unjust enrichment and an accounting. *See* Phansalkar's Amended Complaint ¶¶ 54–137.

AW alleges that, during his tenure at AW, Phansalkar intentionally concealed from his partners at AW that he had appropriated for himself property and opportunities that rightfully belonged to the partnership. According to AW, these actions violated the utmost duties of care, loyalty, and good faith owed by one partner to his other partners and constituted the unauthorized assumption and exercise of ownership over assets that belonged to AW. AW's complaint includes claims for breach of fiduciary duties, conversion and

---

1. The parties disagree as to whether Phansalkar was a partner or an employee.

breach of contract. *See* AW's Second Amended Complaint ¶¶ 28–74.

## III. RELEVANT FACTS [2]

Assuming plaintiff's allegations to be true, the facts relevant to this motion are as follows. In December, 1998, AW and certain other investors formed a limited liability company called Millenium Cell LLC ("MCEL LLC"). *See* 8/1/01 Affidavit of Russell J. Steward, AW employee ("Steward Aff.") ¶ 2. No certificates evidencing the interests of investors in MCEL LLC were ever issued. *See id.* In or around February 2000, Anderson and Weinroth offered to sell Phansalkar up to $100,000 worth of their interests in MCEL LLC, representing a percentage ownership of the company. *See* Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1(a) ("Def.56.1") ¶ 3 (citing 3/27/01 Deposition of Stephen D. Weinroth ("Weinroth Dep."), Ex. B to 8/1/01 Affidavit of Defendants' Attorney Jaculin Aaron ("Aaron Aff."), 46–47). In or around February 2000, Phansalkar purchased 637,902 shares of MCEL LLC from Anderson and Weinroth for $60,000 (the "MCEL Shares"). *See* Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1(a) ("Pl.56.1") ¶ 1. Phansalkar delivered to both Anderson and Weinroth a check for $30,000 as payment for those shares, which each deposited in his respective personal bank account. *See* Phansalkar checks, Ex. B to 8/13/01 Affidavit of Plaintiff's Attorney Sapna Mirchandani ("Mirchandani Aff.").

In April 2000, MCEL was converted into a corporation which was called Millenium Cell Inc. ("MCEL"). *See* Steward Aff. ¶ 4. No common stock certificates for MCEL were issued at this time. *See id.* ¶ 5.

In or about May 2000, AW prepared and maintained ownership schedules reflecting the names, shares and percentage ownership of MCEL investors, including Phansalkar (the "MCEL Ownership Schedules"). *See* Pl. 56.1 ¶ 2. The schedules identified Phansalkar as the owner of 637,902 shares of MCEL. *See id.;* MCEL Ownership Schedules, Ex. C to Mirchandani Aff. In or about May 2000, at the instruction of Weinroth, AW employee Russell J. Steward requested that Phansalkar identify any designees to whom he wished to grant his shares of MCEL stock. *See* Pl. 56.1 ¶ 4. Phansalkar complied with this request and designated certain of his shares to various individuals. *See id.* These designations were reflected on the MCEL Ownership Schedules. *See* MCEL Ownership Schedules.

On May 25, 2000, MCEL submitted an S–1 filing with the Securities Exchange Commission. *See* Pl. 56.1 ¶ 5. The S–1 Filing listed the amount of shares held by each of Andersen and Weinroth as well as other principal shareholders, but did not include the 637,902 MCEL Shares owned by Phansalkar. *See id.* One of the items submitted to the underwriters, accountants and attorneys involved in the proposed public offering was the MCEL Ownership Schedules. *See* 8/2/01 Deposition of Russsell J. Steward, AW employee ("Steward Dep.") at 188–89; Weinroth Dep. at 61–62.

MCEL's initial public offering occurred on August 9, 2000. *See* Steward Aff. ¶ 6. Common stock certificates were issued that same month. *See id.*

In June 2000, Phansalkar resigned from AW. When Phansalkar tendered his resignation, Phansalkar and Anderson discussed the terms of Phansalkar's departure. Anderson codified these terms in a

---

**2.** For the purposes of this motion, AW has assumed that certain factual allegations made by Phansalkar are true. However, AW has not stipulated to any of these facts.

memo (the "June 19th Memo"). *See* June 19th Memo, Ex. D to Mirchandani Aff. On page two of the June 19th Memo, Anderson wrote:

> 4. *MILLENNIUM CELL*
>
> In December, 1999 Steve & I agreed to sell 637,902 shares to RP from our own positions for $60,000. In May, 2000 AW sold shares for the company at $2.90/share. Based on that price 637,902 shares would have been $1,849,916. Upon the conclusion of the I.P.O. now in registration (est. price of $10.00 or $6,379,020 value) the shares will be distributed.

*Id.* at 2.

In late June or July of 2000, Weinroth instructed Steward to redistribute the 637,902 MCEL Shares owned by Phansalkar equally to Weinroth and Anderson, thus transferring 318,961 MCEL shares to each of them. *See* Pl. 56.1 ¶ 7. On September 6, 2000, a month after the MCEL IPO, Anderson and Weinroth first notified Phansalkar that they had redistributed his MCEL Shares to themselves. *See id.* ¶ 8.

## IV. DISCUSSION

AW argues that, even if Phansalkar's factual allegations are true, he cannot maintain an action for conversion under New York law.

### A. Legal Standard for Conversion

■ Conversion is the "[u]nauthorized and wrongful exercise of dominion and control over another's personal property." *Pioneer Commercial Funding Corp. v. United Airlines, Inc.,* 122 B.R. 871, 883 (S.D.N.Y.1991) (quoting *Black's Law Dictionary* 300 (5th ed.1979)). To establish a cause of action for conversion under New York law, a plaintiff must show (1) "legal ownership or an immediate superior right of possession to a specific identifiable thing" and (2) that the defendant "exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Id.* (quoting *Independence Discount Corp. v. Bressner,* 47 A.D.2d 756, 365 N.Y.S.2d 44, 46 (2d Dep't 1975)).

■ Under New York law, the general rule is that "a claim for conversion does not lie for the withholding of indefinite, intangible, and incorporeal species of property." *Matzan v. Eastman Kodak Co.,* 134 A.D.2d 863, 521 N.Y.S.2d 917, 918 (4th Dep't 1987); *see also Speigel v. Quality Bakers of Am. Cooperative, Inc.,* No. 91 Civ. 5703, 1992 WL 349799, at *6 (S.D.N.Y. Nov. 10, 1992) (holding that conversion was not applicable to a provision in a non-exclusive license); *Ippolito v. Lennon,* 150 A.D.2d 300, 542 N.Y.S.2d 3, 6 (1st Dep't 1989) ("New York does not generally recognize a cause of action for conversion of intangible property.") (holding that conversion did not apply to musician's intangible property interest in concert performance). However, New York has extended the tort of conversion to intangible property rights that are "merged in, or identified with, some document" or "relate to specifically identifiable money."[3] *In re Chateaugay*

---

3. Phansalkar cites authorities from a variety of jurisdictions as well as a number of secondary authorities for the proposition that a claim for conversion "will lie with respect to 'intangible rights which are *customarily merged in,* or identified with some document.'" Plaintiff's Memorandum of Law in Opposition to the AW Defendants' Motion for Partial Summary Judgment ("Pl.Opp.") at 6 (quoting W. Prosser & W.P. Keeton, *The Law of Torts* § 92 (5th ed.1984)) (emphasis added). This "customarily merged in" theory is the position taken by the Restatement. *See* Restatement (Second) of Torts ("Restatement") § 242(2) (1965). However, there is no indication that this position has been adopted in New York. Phansalkar cites one New York case that mentions this theory of conversion,

Corp., 156 B.R. 391, 400 n. 10 (S.D.N.Y. 1993) (holding that conversion does not apply to tax benefits allegedly owed under an indemnity contract); *see also Iglesias v. U.S.*, 848 F.2d 362, 364 (2d Cir.1988) (noting that conversion does "include documents which embod[y] an intangible right, such as stock certificates and bonds") (citing *Pierpoint v. Hoyt*, 260 N.Y. 26, 29, 182 N.E. 235 (1932), *rev'd on other grounds*, 236 A.D. 802, 259 N.Y.S. 956 (2d Dep't 1932)).

## B. Analysis

AW claims that Phansalkar cannot sustain a claim for conversion because his interest in MCEL was an intangible interest that was not "specifically identifiable" property. Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment ("Def.Mem.") at 2. *First*, AW asserts that Phansalkar's interest in MCEL was not "merged into or embodied in a tangible document" because, at the time of the alleged conversion, "no stock certificates had been issued." Def. Mem. at 7. *Second*, AW argues that, even if Phansalkar's intangible interest was embodied in some tangible document, that document was not converted. *See* Reply Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment ("Reply Mem.") at 2–3, 5.

## 1. Documents That May Embody or Identify an Intangible Interest

■ AW provides no support for the proposition that the only document that can establish Phansalkar's interest in MCEL is a stock certificate. While New York recognizes that "stock certificates and bonds" are "documents which embod[y] an intangible right," *Iglesias*, 848 F.2d at 364; *see also Pierpoint*, 260 N.Y. at 29, 182 N.E. 235 (recognizing that an interest in shares may be represented by a stock certificate), the courts have not held that the word "documents" is limited to these two items. Indeed, such a proposition would be directly at odds with the New York rule that a certificate is not essential to the existence of a share and that a shareholder may prove her interest by evidence other than that of a certificate. *See In re Zarnin*, 229 A.D.2d 347, 645 N.Y.S.2d 304, 305 (1st Dep't 1996) ("A stock certificate is evidence of shareholder status, but is not necessary to its creation."); *Benincasa v. Garrubbo*, 141 A.D.2d 636, 529 N.Y.S.2d 797, 799 (2d Dep't 1988) ("[T]he mere fact that the petitioner's name does not appear on a record of stockholders or the fact that he does not physically possess stock certificates is not ... conclusive evidence of not owning stock."); *In re Rappaport*, 487

---

but that reference cannot be relied on as a statement of New York law. In *Ippolito v. Lennon*, the court found that an interest in a concert performance was "decidedly intangible," and confirmed that "this State does not generally recognize a cause of action for conversion of intangible property." 542 N.Y.S.2d at 6 (citation omitted). The court went on to explain that "[e]ven under an expanded definition of the tort, conversion is limited to those intangible property rights customarily merged in, or identified with, some document." *Id.* (citing Prosser & Keeton, *The Law of Torts* §§ 91–92; Restatement §§ 222A, 242). While the court recognized the existence of more expanded views of the

tort, it also noted that where the tort has been expanded, that expansion has "come about as the result of legislation." *See id.* Moreover, a post-*Ippolito* decision confirmed that New York law still "does not recognize conversion of intangible property rights unless merged in, or identified with, some document, or unless those rights relate to specifically identifiable money." *In re Chateaugay Corp.*, 156 B.R. at 400 n. 10. Accordingly, *Ippolito* does not expand New York law. *But see Hurst v. Dezer/Reyes Corp.*, 82 F.3d 232, 235 (8th Cir. 1996) (citing *Ippolito* for the proposition that the "customarily merged in theory" might be "as far as the New York courts would expand the scope of conversion.").

N.Y.S.2d 376, 277–78 (2d Dep't 1985). Therefore, it would be inconsistent with New York law to insist that Phansalkar must have physically possessed a stock certificate, as opposed to some other tangible evidence of stock ownership, in order to make a claim of conversion. *See Stimmel v. Weiner,* No. 89 C 6510, 1991 WL 117928, at *3 (N.D.Ill. June 25, 1991) (applying same reasoning under Illinois law); *Connelly v. Estate of Dooley,* 96 Ill.App.3d 1077, 52 Ill.Dec. 462, 422 N.E.2d 143, 147 (1981) (applying same reasoning under Illinois law where plaintiff's shares were evidenced by signed minutes from a meeting).

 Case law also reveals that, in New York, a claim for conversion of shares of stock may lie even if plaintiff does not have a stock certificate evidencing those shares. In *Mahaney v. Walsh,* the New York Supreme Court recognized a cause of action for conversion of stock where "certificates had not been issued for any of [the] shares" allegedly converted. 16 A.D. 601, 44 N.Y.S. 969, 971 (4th Dep't 1897). In support of its conclusion, the court cited *Payne v. Elliot,* 54 Cal. 339 (1880), a California case which more fully explains the reason why an action in trover (the common law predecessor to conversion) was maintainable for shares of stock absent a certificate. In *Payne,* the Supreme Court of California explained:

> The certificate is only evidence of the property; and it is not the only evidence, for a transfer on the books of the corporation, without the issuance of a certificate, vests title in the shareholder: the certificate is, therefore, but additional evidence of title, and if trover is maintainable for the certificate, there is no valid reason why it is not also maintainable for the thing itself which the certificate represents.

*Id.* at 342.

Two more recent cases also demonstrate the New York rule that conversion may apply to intangible interests, such as shares of stock, that are identified in documents other than stock certificates. In *Kubin v. Miller,* plaintiff claimed that defendant had illegally converted plaintiff's shares in a company by diverting those shares to himself and entities he owned. *See* 801 F.Supp. 1101, 1118 (S.D.N.Y.1992). Plaintiff offered a letter agreement, written approximately two years after plaintiff allegedly became entitled to the shares, that acknowledged plaintiff's ownership of a certain percentage of the company. *See id.* at 1109. The court found that plaintiff had properly established a property interest in the shares that were the subject of the conversion claim. *See id.* at 1118. In another case, *Pioneer Commercial Funding Corp. v. United Airlines, Inc.,* the court sustained an action for conversion of accounts receivables that were identified in defendant's "accounting entries." 122 B.R. 871, 885 (S.D.N.Y.1991). The court held that plaintiff had identified "a specific and identifiable piece of property" because the accounting entries evidenced plaintiff's interest in "tangible, marketable assets which can be sold, secured, or traded." *Id.*

### a. The June 19th Memo

 Like the letter agreement in *Kubin,* the June 19th Memo evidences a prior sale of the MCEL Shares to Phansalkar. In that Memo, Anderson acknowledged that he and Weinroth "agreed to sell 637,-902 shares to [Phansalkar]" in December 1999. June 19th Memo at 2. Accordingly, the June 19th Memo identifies Phansalkar's intangible interest in MCEL and establishes Phansalkar's possession of "specifically identifiable property" that may be the subject of a conversion claim. *See Iglesias,* 848 F.2d at 364.

AW seeks to distinguish *Kubin,* claiming that a conversion claim may only rest

"upon the withholding of stock certificates." Def. Mem. at 6, n. 2. (quoting *Kubin*, 801 F.Supp. at 1118). As AW correctly noted, the *Kubin* court stated that plaintiff had alleged a viable conversion claim "to the extent that [plaintiff's] conversion claim rest[ed] upon the withholding of stock certificates." *Kubin*, 801 F.Supp. at 1118. However, when this statement is read in context, it becomes clear that the court was merely distinguishing plaintiff's claim for conversion of shares, which was viable, from his other conversion claims, which were not. *See id.* at 119 n. 16. In any case, AW's attempt to limit *Kubin*'s holding to cases where a plaintiff alleges a failure to turn over stock certificates is self-defeating, for AW explicitly acknowledged that Phansalkar "might claim that AW's actions prevented a stock from being issued to him." Def. Mem. at 7. Thus, even if AW's narrow reading of *Kubin* was accurate, Phansalkar would have a viable conversion action.

AW also attempts to undermine the relevance of *Kubin* by arguing that, if Phansalkar claims that "AW's actions prevented a stock from being issued to him," his claim is more appropriately characterized as one for breach of contract rather than conversion. *Id.* (citing *Cavallo v. Am. Skandia Life Assurance Corp.*, No. 94 Civ. 2908, 1997 WL 251538, at *15 (S.D.N.Y. May 13, 1997) ("[Conversion] may not lie for simple non-performance under an alleged agreement."); *Matzan v. Eastman Kodak Co.*, 134 A.D.2d 863, 521 N.Y.S.2d 917). However, the *Kubin* court specifically found that a claim for conversion of shares that were acknowledged in a letter agreement could be "independent [of] contract claims" alleged under the same agreement. *Kubin*, 801 F.Supp. at 1118. Similarly, Phansalkar could have distinct conversion and contract claims with regard to the June 19th Memo. While Phansalkar's conversion claim could rest upon the first sentence of paragraph 4, which acknowledges an earlier sale of MCEL stock to Phansalkar, he might allege breach of contract based on the second, third and fourth sentences of paragraph 4, in which Anderson purportedly promised to distribute those shares upon the conclusion of the IPO. *See* June 19th Memo at 2.

### b. The MCEL Ownership Schedules

■ Even if the June 19th Memo did not identify or embody Phansalkar's intangible interest in the MCEL Shares, the MCEL Ownership Schedules could serve this purpose. Like the accounting entries in *Pioneer*, the MCEL Ownership Schedules were prepared and maintained by AW as part of its regular course of business. *See* Pl. 56.1 ¶ 2. These schedules list the names, shares and percentage ownership of MCEL investors. *See id.;* MCEL Ownership Schedules. Phansalkar is listed on these schedules as owning 637,902 shares of MCEL. *See id.* Because the MCEL Ownership Schedules identify real assets owned by MCEL investors, including Phansalkar, they identify a specific and identifiable piece of property that may be the subject of conversion. *See Pioneer*, 122 B.R. at 885.

### 2. Conversion of Intangible Interests Embodied or Identified in a Tangible Document

■ AW next argues that even if Phansalkar's interest in MCEL was merged into or identified with a document, Phansalkar fails to allege that this document was itself converted. *See* Reply Mem. at 5–6. This argument fails because, under New York law, a claim for conversion of intangible interests embodied in a tangible document need not allege conversion of the document itself. In both *Kubin* and *Pioneer*, the court sustained a claim for conversion where plaintiff alleged that the

property converted was the intangible property interest that was identified in a document, not the document itself. *See Kubin,* 801 F.Supp. at 1118; *Pioneer,* 122 B.R. at 884; *cf. Mahaney,* 44 N.Y.S. at 972–73 (sustaining claim for conversion of the stock itself).

In addition, the two cases cited by AW to support its position are not persuasive. AW cites the Second Circuit's decision in *Iglesias* for the proposition that "New York will only recognize a claim for conversion of intangible property where there is a conversion of documents that 'embod[y] an intangible right.' " Reply Mem. at 3 (quoting *Iglesias,* 848 F.2d at 364). This quotation has been taken out of context. In *Iglesias,* the Second Circuit merely recognized that "the tort [of conversion has been] extended to include documents which embod[y] an intangible right." *Iglesias,* 848 F.2d at 364. Nowhere did the Court suggest that the document itself must be the property interest converted.[4]

AW also cites *In re Chateaugay,* where the court held that tax benefits allegedly converted did not constitute "specifically identifiable property" because they "were not identified with any documents which have been converted." 156 B.R. at 400 n. 10. While this quotation appears to support AW's proposition, the court's decision did not turn on the distinction between a claim alleging conversion of an intangible interest and a claim alleging conversion of a document evidencing that interest. In *In re Chateaugay,* the court found that, because plaintiff's interest in the tax benefits allegedly converted arose from a promise in an indemnity agreement, the action was more appropriately brought in contract. *Id.* at 399. In a footnote, the court noted that plaintiff could not have established an interest in "specifically identifiable property," but the court did not explain its reasoning. *Id.* at 400 n. 10. Thus, it is not clear whether the court's conclusion was based on plaintiff's failure to offer a document evidencing his purported property interest or his failure to allege that a document was itself converted. As a result, *In re Chateaugay* is not reliable support for AW's argument that Phansalkar must allege conversion of a specific document.[5]

## IV. CONCLUSION

As a matter of law, either the June 19th Memo or the MCEL Ownership Schedules could evidence Phansalkar's interest in specifically identifiable property that may be the subject of conversion. *See* Part III.B.1, *supra.* Phansalkar need not allege that these documents were themselves converted. *See* Part III.B.2, *supra.* To the extent that AW disputes the exis-

4. In *Iglesias,* the court did not even address the elements of a conversion claim. The only issue on appeal was the lower court's calculation of conversion damages. *See* 848 F.2d at 364–65.

5. It is also worth noting that the leading case on conversion of stock certificates did not limit the cause of action to conversion of the stock certificates themselves. In *Pierpoint v. Hoyt,* a New York court first recognized an action for conversion where the item converted was a stock certificate. *See* 260 N.Y. at 29, 182 N.E. 235. In that case, the court explained that "the law must" treat conversion of the certificate as conversion of the stock itself because "[w]rongful acts affecting property rights in corporate stock can *ordinarily* be committed only through the medium of certificates which evidence those rights." *Id.* at 28, 182 N.E. 235 (emphasis added). Apparently, the court reasoned that a claim for conversion of shares "must" lie and that "ordinarily" the only way to show that shares have been converted is by showing that stock certificates have been converted. However, the court did not rule out the possibility that there might be other means of showing that a share was converted.

tence or significance of either of these documents, it presents an issue of fact. Because the July 19th Memo and the MCEL Ownership Schedules are essential to Phansalkar's claim of conversion, any factual disputes regarding these documents are genuine issues of material fact that preclude summary judgment.[6] *See Konikoff*, 234 F.3d at 97; Fed.R.Civ.P. 56(c). For the foregoing reasons, summary judgment is denied.[7]

---

6. Because AW's motion for partial summary judgment has been denied, all of the facts remain in dispute.

7. No determination has been made as to the proper measure of damages for the alleged conversion.